**POWERHOUSE LEGAL, P.C.**
MARC Y. LAZO, SBN: 215998
ALEXANDER A. POWERS, SBN: 350967
21163 Newport Coast Dr. #245
Newport Beach, CA 92657
Phone No.:   (949) 791-4050
Fax No.:      (949) 791-4224
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>     v.<br><br>BARCLAYS PLC, a public limited company; JAMES E. STALEY, an individual; and DOES 1-10 inclusive,<br><br>          Defendants. | CASE No.:<br><br>**COMPLAINT FOR:**<br><br>1. **PARTICIPATION IN A SEX TRAFFICKING VENTURE IN VIOLATION OF TVPA (18 U.S.C. § 1591, et seq.)**<br>2. **CONSPIRACY TO COMMIT VIOLATIONS OF TVPA (18 U.S.C. §§ 1591(a)(2), 1595)**<br>3. **KNOWING BENEFICIARY IN A SEX TRAFFICKING VENTURE IN VIOLATION OF TVPA (18 U.S.C. §§ 1591(a)(2), 1595)**<br>4. **OBSTRUCTION OF ENFORCEMENT OF TVPA (18 U.S.C. § 1591(d))**<br>5. **NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE TO PREVENT PHYSICAL HARM**<br>6. **NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE AS A BANKING** |

**INSTITUTION PROVIDING
NON-ROUTINE BANKING**

**7. NEGLIGENT HIRING**

**[JURY TRIAL DEMANDED]**

Plaintiff Jane Doe, individually and on behalf of all persons so similarly situated that meet the definition of a Class member (as set forth below), allege against Defendants Barclays PLC ("BARCLAYS"), a Public Limited Company; and James Staley ("STALEY"), an individual (collectively, "STRATEGIC PARTNER DEFENDANTS"),[1] as follows:[2]

## **INTRODUCTION**

As further described below, Plaintiff files this class action complaint for monetary damages and other relief pursuant to (among other provisions of

---

[1] At all relevant times alleged herein, the STRATEGIC PARTNER DEFENDANTS were in a Strategic Partnership with the Sex Trafficking Enterprise (defined below).

[2] In addition to the STRATEGIC PARTNER DEFENDANTS, numerous third parties are referenced throughout this Complaint, comprising the following:

- The "Quintessentially Entities": Quintessentially (UK) Limited ("Quintessentially"); Quintessentially, Inc. d/b/a Quintessentially USA; Quintessentially Retail Limited; Quintessentially Aviation Limited; Quintessentially Covered Limited; Quintessentially Gifts Limited; Quintessentially Education Limited; Quintessentially Wine Limited; Lifestyle Concierge Management Limited; Quintessentially Communications Limited; Q Worldwide Limited; C.J. Leigh (Holdings) Limited; Quintessentially Villas Limited; Quintessentially Media Limited; Quintessentially Driven Limited; Quintessentially & Co. Limited; Quintessentially Travel Limited; Quintessentially Ventures Limited; Uttah Worldwide Limited, Peachy Teddy Limited (later renamed Sierra Industries Limited; "Sierra"); MMVM Development Inc. ("MMVM"); and Le Besoin.
- The "Quintessentially Directors": Ben Elliot, Aaron Simpson, Paul Drummond, Ira Michael Birns, and Anthony Leonard Brooke.
- The "Quintessentially Co-Conspirators": WFS UK Holding Partnership LP, Jon Goss, Dean Pemberton, Shahzad Shabbir Dahar ("Dahar"), Emir Eskihancilar, Ramsey Mankarious, Richard Stockton, Haedar Hassan, Jackie Mills, Charles Birkett, Gary Wright, Ana Dukonovic a/k/a Ana Kolarevic, Katarina Larisa Ham, George Cottrell, Andjela Vukadinovic, Mohamed Amersi, Sandra De Souza, Levadny Kirill Olegovich, Anna Vladimirovna, Irina Volskaya, and Yulia Kosova.

governing law): the Federal Anti-Sex Trafficking Statutes—particularly 18 U.S.C. §§ 1589, 1590, 1591, 1593, 1593A, 1594, 1595, and 1596, promulgated under the TRAFFICKING VICTIM PROTECTION ACT ("TVPA").

This action arises out of the STRATEGIC PARTNER DEFENDANTS' support, facilitation, and participation in the Sex Trafficking Enterprise's[3] SEX TRAFFICKING CRIMES and FINANCIAL CRIMES.[4]

As set forth below, the STRATEGIC PARTNER DEFENDANTS knowingly received substantial value and other material benefits from supporting, facilitating, and otherwise participating in the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES, orchestrated by the Sex Trafficking Enterprise (as defined below), and aided and abetted by the Quintessentially Co-Conspirators (all as defined below). The STRATEGIC PARTNER DEFENDANTS knew or should have known that the FINANCIAL CRIMES committed by the Sex Trafficking Enterprise served to enable and otherwise facilitate the SEX TRAFFICKING CRIMES to which Plaintiff and all those similarly situated fell victim. The STRATEGIC PARTNER DEFENDANTS provided the most critical services and assistance to the Sex Trafficking Enterprise, thereby enabling it to prosper and expand its agendas globally to the devastation and detrimental harm of Plaintiff and all others similarly situated, including young females and males.

The STRATEGIC PARTNER DEFENDANTS knew that certain members of the Sex Trafficking Enterprise were regularly committing violations California Code of Civil Procedure § 52.5, California Penal Code § 243.4 (unlawful touching),

---

[3] 18 U.S. Code § 1591 defines a "Venture" as "any group of two or more individuals associated in fact, whether or not a legal entity." Accordingly, the "Sex Trafficking Enterprise" is a "Venture" as defined by the statute.
[4] All capitalized terms are defined below.

and of Title 9 of the California Penal Code, including and especially California Penal Code §§ 261 (rape), 264.1 (aiding and abetting rape), 287 (unlawful oral copulation), and 289 (unlawful sexual penetration). The STRATEGIC PARTNER DEFENDANTS aided and abetted these crimes, and acted in a negligent manner to directly and proximately cause the crimes to be committed by the Sex Trafficking Enterprise against Plaintiff and the other Class members. In fact, STALEY himself actively participated in the Sex Trafficking Enterprise's commission of the criminal acts and unlawful conduct detailed below.

As set forth below, the STRATEGIC PARTNER DEFENDANTS also knew that the Sex Trafficking Enterprise would use means of force, threats of force, fraud, and multiple acts of coercion to cause Plaintiff and other members of the Class to engage in Commercial Sex Acts.

**JURISDICTION AND VENUE**

**Subject Matter Jurisdiction**

1.      This action is brought pursuant to various federal and state statutes, including the TVPA, 18 U.S.C. § 1589 through § 1595. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as well as 18 U.S.C. § 1596(a), as this action asserts violations under the TVPA, and otherwise raises federal questions regarding the deprivation of Plaintiff's rights.

2.      This Court also has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a), because all claims alleged herein arise from a systematic pattern and practice of the criminal acts and unlawful conduct described below, and form part of the same case and controversy.

3.      This action is timely filed pursuant to 18 U.S.C. § 1595(c)(1), which provides that a plaintiff shall have ten years after the cause of action arose to file suit against any person or entity who knowingly benefits, financially or by

receiving anything of value, from participating in a Venture which the person or entity knew or should have known violated laws against Sex Trafficking. This action is also timely because the conspiracy continued until recently.[5]

**Personal Jurisdiction**

4. Specific jurisdiction exists when a case arises out of or relates to the defendant's contacts with the forum that give rise to the harm alleged by the plaintiff.

5. In this respect, BARCLAYS knowingly solicited Plaintiff, a California resident—and other California residents—at the behest of certain members of the Sex Trafficking Enterprise, for the purpose of establishing banking relationships and opening a BARCLAYS bank account that could not otherwise have been established. BARCLAYS had substantial and continuous contacts with California and residents like Plaintiff for this purpose, and established a banking relationship with Plaintiff and other California residents, using their names and

---

[5] Though each of the claims asserted herein is independently timely pursuant to California Code of Civil Procedure § 340.16 (amended pursuant to California Assembly Bill 250 ("AB 250"), any statute of limitations applicable to Plaintiff's claims is tolled due to the STRATEGIC PARTNER DEFENDANTS' affirmative concealment of the facts that give rise to Plaintiff's and the Class's claims, and the continuous and active deception, duress, threats of retaliation, and other criminal acts and unlawful conduct that the Sex Trafficking Enterprise employed to ensure silent cooperation from its victims, including Plaintiff. BARCLAYS participated in the concealment of the criminal acts and unlawful conduct perpetrated by the Sex Trafficking Enterprise, as described herein, as well as its knowledge of STALEY's misconduct. It was not until recently (in June 2025) when the United Kingdom's Upper Tribunal upheld the findings of the Financial Conduct Authority ("FCA") regarding STALEY's relationship with known Sex Trafficker Jeffery Epstein and its imposition of a lifetime ban against STALEY holding senior management roles in the financial services industry that the extent of such criminal acts and unlawful conduct was revealed.

personal identifying information to open an account. To this end, multiple BARCLAYS employees engaged in numerous communications involving Plaintiff and other California residents, and in doing so purposefully targeted California and availed itself of the privilege of conducting business in this state.

6.   In doing so, BARCLAYS took proactive measures to procure the passports of Plaintiff and other California residents to establish the account. Moreover, BARCLAYS knowingly opened Plaintiff's account for the purpose of operating a business in California, which was integral to the perpetration of the SEX TRAFFICKING CRIMES and the FINANCIAL CRIMES.

7.   BARCLAYS had direct knowledge that this account would be operated by California residents specifically for the purpose of conducting business in California, yet entirely failed to conduct any appropriate due diligence or otherwise take even minimal measures to determine the actual purpose of the business and establishment of the account. Had BARCLAYS undertaken a reasonable investigation or otherwise attempted to comply with its non-delegable "Know Your Customer" obligations, the harm from which Plaintiff and the other Class members suffered and continue to suffer would have been prevented.

8.   Furthermore, the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES described below were funded through BARCLAYS bank accounts—including Plaintiff's—that processed payments, funneled laundered monies, and were otherwise used to direct the financial transactions underlying the criminal acts and unlawful conduct perpetrated by the Sex Trafficking Enterprise. Such acts and conduct were purposely directed to and perpetrated through financial institutions in California—including correspondent banks of BARCLAYS in California—and could not have been carried out without the facilitation of Plaintiff and other California residents whom BARCLAYS knew would be used as the necessary

instrumentalities to effectuate the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES.

9.      As set forth below, prior to establishing Plaintiff's account using her personal identifying information and the personal information of other California residents, BARCLAYS had a longstanding banking relationship with the Quintessentially Entities resulting in the establishment of dozens of bank accounts over the course of several years.  As further set forth below, BARCLAYS had preexisting knowledge of STALEY's and the Sex Trafficking Enterprise's history of criminal acts and unlawful conduct as alleged herein. As such, BARCLAYS knew that Plaintiff's account and the California business operations would be used for the same acts and conduct directly and proximately resulting in the harm from which Plaintiff and the other Class members continue to suffer.

10.     Rather than identify these red flags and dutifully prevent the opening of Plaintiff's account, BARCLAYS enabled and facilitated the establishment of the account, and ultimately paved the way for the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES to occur. Simply put, but for the establishment of the banking relationships with Plaintiff and other California residents, which included the opening of Plaintiff's BARCLAYS account, the SEX TRAFFICKING CRIMES and the FINANCIAL CRIMES could not have been effectuated.[6]

---

[6] Not surprisingly, the FCA has fined BARCLAYS multiple times for several millions pounds—including as recently as 2025—for failing to take appropriate measures to minimize the risk that its resources would be used to facilitate financial crimes conducted by its customers, and for allowing such crimes to occur. BARCLAYS has been found to have gone to "unacceptable lengths to accommodate [its] clients," including failing to obtain information "that it was required to obtain from the clients to comply with financial crime requirements." *See* https://www.fca.org.uk/news/press-releases/fca-fines-barclays-%C2%A372-million-poor-handling-financial-crime-risks.     This is precisely the conduct

## Venue

11. Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial number of the criminal acts and unlawful conduct alleged herein and perpetrated against Plaintiff and the other members of the Class (as defined below) occurred in this district.

## PARTIES AND THIRD PARTIES

### Plaintiff

12. Plaintiff is and was, at all relevant times, an induvial residing in California who was victimized by the STRATEGIC PARTNER DEFENDANTS in the manner set forth below. Given the nature and severity of the allegations herein and in the interest of Plaintiff's recognized privacy rights, and to avoid being stigmatized, Plaintiff rightfully pursues this action under the pseudonym "Jane Doe."

### Strategic Partner Defendants

13. BARCLAYS is a global financial institution that transacts substantial business in California, and on information and belief, has a substantial customer base in this state.

14. On further information and belief, BARCLAYS currently conducts substantial business in this District and did so at all relevant times alleged herein.

15. In perpetrating the criminal acts and unlawful conduct alleged in this Complaint, BARCLAYS used the means and instrumentalities of interstate commerce, including but not limited to electronic technologies, as well as the United States Postal Service and interstate telecommunication systems, to conduct and facilitate the financial transactions described herein.

---

BARCLAYS undertook for the benefit of the members of the Sex Trafficking Enterprise.

16.    At all times relevant herein, STALEY was the Chief Executive Officer of BARCLAYS. Before STALEY was employed by BARCLAYS, he was the Chief Executive Officer of J.P. Morgan Chase. On information and belief, STALEY and J.P. Morgan Chase parted ways in the aftermath of the public revelations exposing his relationship and complicity in the Sex Trafficking enterprise of Jeffrey Epstein and his cohorts and accomplices.

## Doe Defendants

17.    The true names and capacities of the Defendants sued as Does 1 through 10, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff will seek leave of Court to amend this Complaint when the true names and capacities of these Defendants have been ascertained. Plaintiff is informed and believes that all such Defendants are responsible in some manner for the criminal acts and unlawful conduct alleged herein, directly and proximately resulting in the harm to Plaintiff and the other members of the Class as alleged herein.

18.    Plaintiff is further informed and believes that at all times relevant herein, Does 1 through 6, and each of them, was the principal, agent, representative, partner, joint-venturer, co-conspirator, employee or alter ego of each of the other STRATEGIC PARTNER DEFENDANTS, and in committing the criminal acts and unlawful conduct alleged herein, was acting within the course and scope of such relationship with the full knowledge, consent, authority and/or ratification of the STRATEGIC PARTNER DEFENDANTS.

19.    Plaintiff is further informed and believes that at all times relevant herein, Does 7 through 10, and each of them, was an entity or individual who is in some manner responsible for committing the criminal acts and unlawful conduct alleged herein.

COMPLAINT
Page 10

**<u>Third Parties</u>**

20. Ben Elliot ("Elliot"), on information and belief, was a Director of Quintessentially during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Elliot had an ongoing personal and business relationship with the STRATEGIC PARTNER DEFENDANTS in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein. In fact, Elliot is a documented customer of BARCLAYS.

21. Aaron Simpson ("Simpson"), on information and belief, was a Director of Quintessentially during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Simpson had an ongoing personal and business relationship with the STRATEGIC PARTNER DEFENDANTS in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein. In fact, Simpson is a documented customer of BARCLAYS.

22. Paul Drummond ("Drummond"), on information and belief, was a Director of Quintessentially during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Drummond had an ongoing personal and business relationship with the STRATEGIC PARTNER DEFENDANTS in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

23. Ira Michael Birns ("Birns"), on information and belief, was a Director of Quintessentially during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Birns had an ongoing personal and business relationship with the STRATEGIC PARTNER DEFENDANTS in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

24. Anthony Leonard Brooke ("Brooke"), on information and belief, was a Director of Quintessentially during the times of the acts and omissions alleged

herein. At all relevant times mentioned herein, Brooke had an ongoing personal and business relationship with the STRATEGIC PARTNER DEFENDANTS in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein. Specifically, Brooke previously acted as a directory for Barclays Capital Finance Limited, a BARCLAYS affiliated subsidiary.

25. Elliot, Simpson, Drummond, Birns, and Brooke are collectively referred to as the "Quintessentially Directors."

26. WFS UK Holding Partnership LP ("WFS"), on information and belief, is a wholly owned subsidiary of World Kinect Corporation (f/k/a World Fuel Services). At all relevant times mentioned herein, WFS had decision-making authority in the Quintessentially Entities by virtue of its controlling interest in Quintessentially. Further, WFS had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

27. Jon Goss ("Goss"), on information and belief, was a Global Licensing Director and Senior Vice President of Quintessentially during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Goss had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

28. Dean Pemberton ("Pemberton"), on information and belief, was a senior executive of Quintessentially during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Pemberton had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

29.     Shahzad Shabbir Dahar ("Dahar"), on information and belief, was a business associate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Dahar had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

30.     Emir Eskihancilar ("Eskihancilar"), on information and belief, was a business associate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Eskihancilar had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

31.     Ramsey Mankarious ("Mankarious"), on information and belief, was a business associate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Mankarious had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

32.     Richard Stockton ("Stockton"), on information and belief, was a business affiliate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Stockton had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

33.     Haedar Hassan ("Hassan") on information and belief, was a member of Quintessentially's personnel during the times of the acts and omissions alleged

herein. At all relevant times mentioned herein, Hassan had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

34.    Jackie Mills ("Mills") on information and belief, was a business affiliate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Mills had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

35.    Charles Birkett ("Birkett"), on information and belief, was a business affiliate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Birkett had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

36.    Gary Wright ("Wright"), on information and belief, was a business affiliate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Wright had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

37.    Ana Dukonovic a/k/a Ana Kolarevic ("Kolarevic"), on information and belief, was a business affiliate and legal representative of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Kolarevic had a continuous and ongoing business

relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

38.    Katarina Larisa Ham ("Ham"), on information and belief, was a business affiliate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Ham had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

39.    George Cottrell ("Cottrell"), on information and belief, was a business affiliate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Cottrell had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

40.    Andjela Vukadinovic ("Vukadinovic"), on information and belief, was a business affiliate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Vukadinovic had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

41.    Mohamed Amersi ("Amersi"), on information and belief, was a business affiliate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Amersi had a continuous and ongoing business relationship with the Quintessentially Directors

and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

42.    Sandra De Souza ("De Souza"), on information and belief, was a business affiliate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, De Souza had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

43.    Levadny Kirill Olegovich ("Olegovich"), on information and belief, was a business affiliate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Olegovich had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

44.    Anna Vladimirovna ("Vladimirovna"), on information and belief, was a business affiliate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Vladimirovna had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

45.    Irina Volskaya ("Volskaya"), on information and belief, was a business affiliate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Volskaya had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

46. Yulia Kosova ("Kosova"), on information and belief, was a business affiliate of the Quintessentially Entities during the times of the acts and omissions alleged herein. At all relevant times mentioned herein, Kosova had a continuous and ongoing business relationship with the Quintessentially Directors and the Quintessentially Entities in which they acted in concert to commit the criminal acts and unlawful conduct alleged herein.

47. WFS, Goss, Pemberton, Dahar, Eskihancilar, Mankarious, Stockton, Birkett, Wright, Kolarevic, Ham, Cottrell, Vukadinovic, Amersi, De Souza, Olegovich, Vladimirovna, Volskaya, and Kosova are collectively referred to as the "Quintessentially Co-Conspirators."

48. Quintessentially is, on information and belief, a British concierge private limited company with a Companies House number of 03879072 and was founded by the Quintessentially Directors. Quintessentially maintained offices in New York at all relevant times alleged herein.

49. Quintessentially, Inc. d/b/a Quintessentially USA ("Q USA") is, on information and belief, a Delaware corporation formed and existing as an alter ego of Quintessentially by reason of sharing the same principals and staff employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Simpson is the CEO of Q USA.

50. Quintessentially Retail Limited, a private limited UK company ("QRL") is, on information and belief, an alter ego of Quintessentially by reason of operating from the same business address and sharing the same principals and staff employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Its

registered office address is 29 Portland Place, London, W1B 1QB, United Kingdom, and its shared principals have included the Quintessentially Directors.

51.   Quintessentially Aviation Limited, a private limited UK company ("QAL") is, on information and belief, an alter ego of Quintessentially by reason of operating from the same business address and sharing the same principals and staff employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Its registered office address is 29 Portland Place, London, W1B 1QB, United Kingdom, and its shared principals have included the Quintessentially Directors.

52.   Quintessentially Covered Limited, a private limited UK company ("QCL") is, on information and belief, an alter ego of Quintessentially by reason of operating from the same business address and sharing the same principals and staff employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Its registered office address is 29 Portland Place, London, W1B 1QB, United Kingdom, and its shared principals have included the Quintessentially Directors.

53.   Quintessentially Gifts Limited, a private limited UK company ("QGL") is, on information and belief, an alter ego of Quintessentially by reason of operating from the same business address and sharing the same principals and staff employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Its registered office address is 29 Portland Place, London, W1B 1QB, United Kingdom, and its shared principals have included the Quintessentially Directors.

54.   Quintessentially Education Limited, a private limited UK company ("QEL") is, on information and belief, an alter ego of Quintessentially by reason of operating from the same business address and sharing the same principals and staff

employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Its registered office address is 29 Portland Place, London, W1B 1QB, United Kingdom, and its shared principals have included the Quintessentially Directors.

55. Quintessentially Wine Limited, a private limited UK company ("QWINEL") is, on information and belief, an alter ego of Quintessentially by reason of operating from the same business address and sharing the same principals and staff employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Its registered office address is 29 Portland Place, London, W1B 1QB, United Kingdom, and its shared principals have included the Quintessentially Directors.

56. Q Worldwide Limited, a private limited UK company ("QWL") is, on information and belief, an alter ego of Quintessentially by reason of operating from the same business address and sharing the same principals and staff employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Its registered office address is 29 Portland Place, London, W1B 1QB, United Kingdom, and its shared principals have included the Quintessentially Directors.

57. C.J. Leigh (Holdings) Limited, a private limited UK company ("CJLL") is, on information and belief, an alter ego of Quintessentially by reason of operating from the same business address and sharing the same principals and staff employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Its registered office address is 29 Portland Place, London, W1B 1QB, United Kingdom, and its shared principals have included the Quintessentially Directors.

58.    Quintessentially Villas Limited, a private UK limited company ("QVL") is, on information and belief, an alter ego of Quintessentially by reason of operating from the same business address and sharing the same principals and staff employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Its registered office address is 29 Portland Place, London, W1B 1QB, United Kingdom, and its shared principals have included the Quintessentially Directors.

59.    Quintessentially Media Limited, a private limited UK company ("QML") is, on information and belief, an alter ego of Quintessentially by reason of operating from the same business address and sharing the same principals and staff employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Its registered office address is 29 Portland Place, London, W1B 1QB, United Kingdom, and its shared principals have included the Quintessentially Directors.

60.    Quintessentially Driven Limited, a private limited UK company ("QDL") is, on information and belief, an alter ego of Quintessentially by reason of operating from the same business address and sharing the same principals and staff employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Its registered office address is 29 Portland Place, London, W1B 1QB, United Kingdom, and its shared principals have included the Quintessentially Directors.

61.    Quintessentially & Co. Limited, a private limited UK company ("Q&CL") is, on information and belief, an alter ego of Quintessentially by reason of operating from the same business address and sharing the same principals and staff employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Its

registered office address is 29 Portland Place, London, W1B 1QB, United Kingdom, and its shared principals have included the Quintessentially Directors.

62. Quintessentially Travel Limited, a private limited UK company ("QTL") is, on information and belief, an alter ego of Quintessentially by reason of operating from the same business address and sharing the same principals and staff employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Its registered office address is 29 Portland Place, London, W1B 1QB, United Kingdom, and its shared principals have included the Quintessentially Directors.

63. Quintessentially Ventures Limited, a private limited UK company ("Q Ventures") is, on information and belief, an alter ego of Quintessentially by reason of operating from the same business address and sharing the same principals and staff employees, as well as sharing assets and commingling bank accounts, among other commonalities, mandating that their corporate existences be disregarded. Its registered office address is 29 Portland Place, London, W1B 1QB, United Kingdom, and its shared principals have included the Quintessentially Directors.

64. Uttah Worldwide Limited ("Uttah") is, on information and belief, a British Virgin Islands limited company, with its registered office address located at Trident Chambers, P.O. Box 146, based in Road Town, Tortola, British Virgin Islands, registered under No. 1910283. At all relevant times mentioned herein, Uttah was an alter ego of Simpson and used as a "tax shelter" and money laundering vehicle to the benefit of certain members of the Sex Trafficking Enterprise and certain Third Parties, due to the favorable tax laws and fiscal policies of its place of incorporation. In particular, Plaintiff is informed and believes that Simpson's sister, Rebecca Alana Lewis a/k/a Rebcca Tucker a/k/a Rebecca Simpson is the sole director of Uttah and a former director and shareholder of multiple

Quintessentially affiliated entities, and has been used as a puppet to enable and further the FINANCIAL CRIMES (as defined below).

65.     Le Besoin, on information and belief, was an online platform founded by the Quintessentially Directors in or around 2013. The Le Besoin website was registered to the same address as Quintessentially—29 Portland Place, London, W1B 1QB, United Kingdom.  Plaintiff is informed and believes that at all relevant times herein, the online platform through which Le Besoin conducted its online business operations served as an international escort agency and instrumentality to further the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES. Such operations were conducted, controlled, and managed by the Quintessentially Directors.

66.     Quintessentially; Quintessentially, Inc. d/b/a Quintessentially USA; Quintessentially Retail Limited; Quintessentially Aviation Limited; Quintessentially Covered Limited; Quintessentially Gifts Limited; Quintessentially Education Limited; Quintessentially Wine Limited; Lifestyle Concierge Management Limited; Quintessentially Communications Limited; Q Worldwide Limited; C.J. Leigh (Holdings) Limited; Quintessentially Villas Limited; Quintessentially Media Limited; Quintessentially Driven Limited; Quintessentially & Co. Limited; Quintessentially Travel Limited; Quintessentially Ventures Limited; Uttah Worldwide Limited; and Le Besoin shall collectively be referred to as the "Quintessentially Entities."

67.     Each of Quintessentially Entities and Quintessentially Directors, in addition to each of the Quintessentially Co-Conspirators, shall collectively be referred to as the "Sex Trafficking Enterprise."

//

//

## **<u>THE TRAFFICKING VICTIMS PROTECTION ACT</u>**

68.   The TRAFFICKING VICTIM PROTECTION ACT (TVPA)[7] outlaws Sex Trafficking activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States. It is to be construed broadly because it serves a remedial purpose and uses intentionally broad language.

69.   The TVPA forbids the following Sex Trafficking conduct:

    a) Whoever knowingly—

    i.  in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

    ii.  benefits, financially or by receiving anything of value, from participation in a Venture which has engaged in an act described in violation of paragraph (1),

    knowing, or, except where the act constituting the violation of paragraph is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection

---

[7] The TVPA was enacted in 2000, and has been subsequently expanded and supplemented by numerous "comprehensive bills designed to bring the full power and attention of the federal government to the fight against human trafficking." https://www.justice.gov/humantrafficking/key-legislation#:~:text=Among%20other%20things%2C%20the%20Trafficking,or%20accompanying%20the%20federal%20government.

COMPLAINT
Page 23

(e)(2),[8] or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).[9] 18 U.S.C. § 1591(a).

70.    The TVPA also contains an explicit "civil remedy" provision which allows an individual who is a victim of a violation of Chapter 77 of Title 18 to bring a civil action against the perpetrator and any person or entity who knowingly benefits, financially or by receiving **anything** of value, from participation in an illegal Sex Trafficking Venture. 18 U.S.C. § 1595(a).

71.    Unlike the criminal penalties provision in the TVPA, the "civil remedy" provision contains an expansive "Constructive Knowledge" provision. This provision allows a civil action to be brought not only against a person or entity who participates in a Venture known to have engaged in illegal Sex Trafficking, but also against a person or entity who participates in a Venture that the person or entity **should have known** has engaged in illegal Sex Trafficking. 18 U.S.C. § 1595(a). The provision thus expressly disavows any requirement of proving actual knowledge as part of a plaintiff's civil damages claim brought under this section.

72.    Accordingly, as alleged herein, Plaintiff's averments that the STRATEGIC PARTNER DEFENDANTS knowingly acted in furtherance of the Sex Trafficking Enterprise's SEX TRAFFICKING CRIMES through means

---

[8] Pursuant to subsection (e)(2) the term "coercion" means: (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process.

[9] Subsection (b) authorizes criminal penalties including fines and imprisonment for life.

prohibited by the TVPA are also intended to allege that the STRATEGIC PARTNER DEFENDANTS, at the very minimum, had Constructive Knowledge that the Sex Trafficking Enterprise used such prohibited means in violation of the TVPA.

## WELL-ESTABLISHED BANKING REGULATIONS EXIST TO PREVENT THE VERY CONDUCT FOR WHICH THE STRATEGIC PARTNER DEFENDANTS ARE LIABLE

73. The Federal Bank Secrecy Act ("BSA") requires financial institutions to have adequate anti-money laundering ("AML") systems in place. California state law also requires financial institutions to devise and implement protective systems reasonably designed to identify and report suspicious activity and take active steps to prevent and prohibit transactions prohibited by law.

74. All regulated institutions are expected to devise systems based on their unique risk factors, such as their size presence in particularly high-risk jurisdictions; and the specific lines of business in which their customers are involved, and further have an affirmative duty to ensure that their systems run effectively.

75. In addition to having effective AML controls in place, it is also necessary for financial institutions to monitor their customers for the purpose of preventing them from engaging in criminal activities and unlawful conduct using institutional facilities.

76. As part of the affirmative duty to prevent criminal activity, the Know Your Customer ("KYC") regulations and guidelines are critically important for financial institutions to implement, such that they must collect sufficient customer information at the time of establishing new relationships, including as is necessary to assess particular risks associated with the customer. To properly consider these

risks, financial institutions must consider relevant factors such as the nature of the customer's business; the purpose of the customer's prospective account(s); and the nature and duration of the prospective relationship.

77.    Financial institutions must also conduct KYC reviews for each customer relationship at intervals commensurate with the AML risks posed by the customer, including periodically reviewing account activity to determine whether such activity fits with what would have been expected given the nature of the account. Each customer's AML risk should also be re-assessed if new information or unexpected activity occurs.

78.    Additionally, under both Federal and California law, financial institutions are required to timely file a Suspicious Activity Report ("SAR") as soon as it suspects or has reason to suspect that a particular financial transaction may be unlawful or has no apparent lawful purpose, or is initiated in furtherance of unlawful conduct. As described herein, the STRATEGIC PARTNER DEFENDANTS entirely failed to do so at all relevant times, and even enabled and facilitated the criminal acts and unlawful conduct described below.

79.    Financial institutions must also establish criteria for determining when a customer relationship poses an unreasonable risk of violating governing regulations or guidelines, and are charged with the obligation to terminate such relationships before any such violations take place. They are thus liable for any unlawful conduct that ensues if they maintain such relationships despite indications of impropriety.

//

//

//

//

COMPLAINT
Page 26

# I.

## <u>INTRODUCTION TO THE SEX TRAFFICKING CRIMES AND FINANCIAL CRIMES ENABLED AND FURTHERED BY THE STRATEGIC PARTNER DEFENDANTS</u>

80. The Sex Trafficking Enterprise was spearheaded by Elliot, Simpson, and Drummond.

81. As set forth below, the Sex Trafficking Enterprise—by and through business and personal relationships with STALEY—utilized BARCLAYS' resources and facilities to perpetrate and bring the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES to levels of global infiltration that would not otherwise have been possible.

82. As further set forth below, the SEX TRAFFICKING CRIMES—perpetrated by the Sex Trafficking Enterprise and supported, facilitated, and otherwise participated in by the STRATEGIC PARTNER DEFENDANTS—were part of an elaborate scheme devised to sexually traffic, abuse, exploit, and otherwise manipulate Plaintiff and the other members of the Class.

83. Moreover, in addition to the tremendous financial benefits they independently generated, the FINANCIAL CRIMES enabled and furthered the SEX TRAFFICKING CRIMES, through which the Sex Trafficking Enterprise was able to solicit, recruit and ensnare vulnerable young females and males and indoctrinate them into the perverse, bigoted, and corrupt culture of the Quintessentially Entities.

84. Plaintiff thereby became embedded in a culture that fed off their incessant trust and dependency, ensuring their complete obedience to the Sex Trafficking Enterprise, and enabling the perpetration of the SEX TRAFFICKING

CRIMES. Plaintiff and the Class members lives were consumed for the benefit of the Enterprise.

85. Without access to BARCLAYS—and particularly STALEY—the Sex Trafficking Enterprise would have been unable to perpetrate the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES at the globally expansive levels they reached.

86. The STRATEGIC PARTNER DEFENDANTS knew—or at the very minimum should have known—of the Sex Trafficking Enterprise's SEX TRAFFICKING CRIMES and FINANCIAL CRIMES, including the illicit sources of financial transactions, particularly in light of the systematic nature of the criminal conduct perpetrated by the Enterprise.

87. In this regard, as explained below, despite their intimate knowledge and insight into the Sex Trafficking Enterprise's criminal acts and unlawful conduct, the STRATEGIC PARTNER DEFENDANTS' malfeasance went far beyond merely failing to extricate themselves from any involvement with the Enterprise—and even beyond simply acquiescing to the aforementioned conduct—extending to actively aiding and abetting the activities of the Enterprise, particularly by virtue of the conduct of executives like STALEY, who himself conspicuously engaged in Commercial Sex Acts alongside certain Quintessentially Directors and Sex Trafficking Enterprise Patrons (defined below).

88. As such, as further set forth below, the STRATEGIC PARTNER DEFENDANTS not only enabled and furthered the conduct of the Sex Trafficking Enterprise through the depository and clearing house functions they served and the financial transactions they facilitated; they boldly enjoyed the fruits of their active aiding and abetting in participating in the grotesque, barbarous, and dehumanizing acts perpetrated by the Sex Trafficking Enterprise and its Patrons.

89.    As set forth below, however, the stringent federal laws imposed on financial institutions—particularly those of BARCLAYS' caliber—do not require any such active participation; they merely require that the STRATEGIC PARTNER DEFENDANTS benefited in any way, or anticipated any benefit, from their knowing participation or consent to the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES. Accordingly, the STRATEGIC PARTNER DEFENDANTS' punitive liability and culpability for the criminal acts and unlawful conduct perpetrated by the Sex Trafficking Enterprise—occurring over the course of several years—is well-established.

## II.

## <u>SEX TRAFFICKING CRIMES</u>

### A. <u>Introduction</u>

90.    The construction of the SEX TRAFFICKING CRIMES (defined below) by the Sex Trafficking Enterprise was contrived to remove any semblance of sovereignty from its victims. This system was perpetrated through forceful and coercive tactics, with the intentional design of cultivating the total dependency of young females and males to manufacture their complete obedience.

91.    In this regard, Plaintiff reasonably believed that they were required to submit to the perverse and depraved acts expected of them in furtherance of the SEX TRAFFICKING CRIMES, and otherwise comply with anything demanded of them.

92.    The SEX TRAFFICKING CRIMES—spearheaded by the Sex Trafficking Enterprise, and at a minimum consented to by the Quintessentially Co-Conspirators—were developed through a methodical system of recruitment into which Plaintiff and those others similarly situated fell prey.

93.    Through these systematic schemes, designed to establish omnipotence over Plaintiff and all those similarly situated, the implementation of the SEX TRAFFICKING CRIMES was enabled. In this regard, the members of the Sex Trafficking Enterprise engaged in at least the following depraved and perverse conduct in furtherance of the SEX TRAFFICKING CRIMES:

      a) Forcing Plaintiff to engage in "Commercial Sex Acts" (as defined in 22 U.S.C. § 7102);

      b) Physically and sexually assaulting Plaintiff;

      c) Forcing Plaintiff to engage in sex acts with others;

      d) Coercing Plaintiff to engage in sex acts on film;

      e) Confining Plaintiff against their will for purposes of engaging in Commercial Sex Acts; and

      f) Threatening violence against Plaintiff or their family members in retaliation for any disobedience.

94.    Numerous of these acts occurred in this district, where Commercial Sex Acts with Quintessentially principals and the Sex Trafficking Enterprise Patrons (defined below) induced by force, fraud, or coercion took place. On some occasions, Plaintiff and other Class members were repeatedly sexually assaulted and forced to engage in Commercial Sex Acts of a particularly grotesque, barbarous, and dehumanizing nature. As further set forth below, STALEY has boldly participated in these criminal acts and has attended many Sex Trafficking Enterprise events, thereby enjoying the fruits of the unlawful conduct facilitated by the STRATEGIC PARTNER DEFENDANTS.

//

//

//

**B. <u>Specific Illustrations of the Grotesque, Barbarous, and Dehumanizing Acts Committed in Furtherance of the SEX TRAFFICKING CRIMES</u>**

95.    In addition to STALEY,[10] some of the more prominent members of the SEX TRAFFICKING ENTERPRISE PATRONS include:

a)    Jeffrey Epstein;

b)    Prince Andrew (Duke of York);

c)    Alain Delon;

d)    Tale Heydarov (son of Khamaladin Heydarov, a politician and close ally of the President of Azerbaijan Ilham Aliyev);

e)    Oleg Deripaska (Russian oligarch and close associate of Vladimir Putin);

f)    Peter Benjamin Mandelson (British Labour Party politician who formerly served as First Secretary of State);

g)    Nathaniel Phil Victor James Rothschild (British-born financier and member of the Rothschild family); and

h)    Saif al-Islam (son of Libya's former dictator Omar Gadafi).

96.    These individuals, who as set forth below actively participated in Commercial Sex Acts with Plaintiff and other members of the Class in furtherance of the SEX TRAFFICKING CRIMES, are collectively referred to as the "Sex Trafficking Enterprise Patrons."

97.    The Sex Trafficking Enterprise hosted many sex parties, veiled as social functions and Quintessentially events, at which the Sex Trafficking Enterprise Patrons were frequently in attendance. The Sex Trafficking Enterprise,

---

[10] In addition to being a Defendant, STALEY was also an established client of Quintessentially and attended numerous events and parties hosted by the Sex Trafficking Enterprise.

by and through the Quintessentially Directors, would provide young females and males for the nefarious pleasures of those in attendance, in exchange for valuable consideration, including financial rewards and political accommodations.

98.    By way of example, Plaintiff and other Class members were repeatedly sexually assaulted, forced and/or coerced to engage in Commercial Sex Acts of a particularly grotesque, barbarous, and dehumanizing nature at these sex parties. Specific instances of this horrendous conduct are outlined below:[11]

## 1. The Enterprise's Routine Pattern and Practice in Southern California

99.    Members of the Sex Trafficking Enterprise hosted numerous all-expenses-paid events in Southern California. Plaintiff and other members of the Class were coerced into attending such events on the false pretense that their social

---

[11] The SEX TRAFFICKING CRIMES enumerated herein are presented by way of example and by no means constitute an exhaustive list of criminal acts and unlawful conduct perpetrated by the Sex Trafficking Enterprise. To this end, Plaintiff is further aware of a multitude of other instances of criminal acts and unlawful conduct committed by the Sex Trafficking Enterprise and supported by the STRATEGIC PARTNER DEFENDANTS including, but not limited to:
- Multiple parties at which certain SEX TRAFFICKING ENTERPRISE PATRONS engaged in "riding" and other sadistic Commercial Sex Acts with victims;
- Multiple events—including those at which STALEY was present—at which members of the Enterprise engaged in Commercial Sex Acts with a multitude of victims;
- Parties attended by prominent international political figures at which Commercial Sex Acts with victims were exchanged for consideration including non-monetary things of value such as political favors (particularly for Elliot); and
- Other events hosted by the Enterprise at which multiple Class members engaged in Commercial Sex Acts against their will through means of force, threats of force, fraud, or coercion.

attendance was needed to bolster the image and credibility of the Enterprise members.

100. During such events or immediately thereafter, Plaintiff and other members of the Class were coerced into engaging in Commercial Sex Activities with members of the Enterprise while intoxicated.

### 2. The House of Horrors

101. Similarly, the Sex Trafficking Enterprise hosted a party at a rented facility located in in this District. The party was attended by certain members of the Class.

102. Though the individuals who attended did so under the guise that they would be attending as social guests, upon arriving to the party, certain Class members were informed that they would not be allowed to leave the premises throughout the entirety of their stay unless permission was granted to them by a member of the Sex Trafficking Enterprise.

103. During their stay, a multitude of acts of sexual violence were committed against certain Class members, whose after-the-fact consent was attempted to be purchased by certain members of the Enterprise.

### 3. Entertainment Awards Escapade

104. On another occasion, Plaintiff was invited by members of the Sex Trafficking Enterprise to attend a well-known and celebrity driven event hosted in this District to celebrate the accolades of the world's top entertainers.

105. At this event, Plaintiff was coerced into engaging in Commercial Sex Acts with a member of the Enterprise under the fraudulent pretense that they would be introduced to a multitude of A-List celebrities.

106. Following this event, Plaintiff particularly witnessed Goss's remorse for having engaged in such conduct with a victim.

### 4.  The Sex Trafficking Enterprise's Riding Parties

107.    On multiple occasions, members of the Enterprise organized events at which they provided female "entertainment," including victims who were fraudulently coerced and/or forced into providing sexual services for the attendees at the behest of the Enterprise.

108.    At one event, Prince Andrew proceeded to sexually and physically abuse at least one of the "masseuses"—a member of the Class. Other acts of abuse included "riding" attendee victims[12] and putting cigarettes out on the victims' bodies, among other barbarous acts enjoyed by the Sex Trafficking Enterprise Patrons.

109.    On another occasion, Elliot arranged two females for Prince Andrew, though Prince Andrew's interest was particularly piqued by a victim, who was notably was seventeen (17) years old at the time, and who was used by Prince Andrew to commit  acts of sexual assault, using his ascendancy to abuse her in accordance with Elliot's arrangement.

110.    During the same occasion, Prince Andrew then beckoned ELLIOT to remove this victim out of his designated room and replace her with another victim arranged by Elliot, in furtherance of the SEX TRAFFICKING CRIMES.

111.    At another such party attended by Jeffrey Epstein, Prince Andrew became extremely intoxicated and began dancing around the party wearing a wig and skirt, harassing at least two of the Class members.

---

[12] "Riding" refers to the dehumanizing act of mounting and causing the victim to assume the role of a horse (or other animal) for the sexual gratification of the "Rider." Such "Riding Parties" were commonplace for the SEX TRAFFICKING ENTERPRISE PATRONS at the behest of the SEX TRAFFICKING ENTERPRISE, as further set forth below.

## 5. The Sex Trafficking Enterprise's Strip Club Nightmares

112. Certain members of the Class were on numerous occasions taken to strip clubs by members of the Sex Trafficking Enterprise.

113. During these strip club visits, certain Class members would be pressured into becoming intoxicated, and subsequently forced or coerced into engaging in non-consensual and demeaning Commercial Sex Acts with the Quintessentially Directors, and the Sex Trafficking Enterprise Patrons, amongst others. Plaintiff is also informed and believes that these individuals persuaded strippers to leave clubs with them for the purpose of engaging in the same acts along with certain Class members. In this manner, more and more victims were recruited into the SEX TRAFFICKING CRIMES (defined below).

## 6. Puerto Rico Party: Prison in Paradise

114. Members of the Sex Trafficking Enterprise also hosted a large gathering in Puerto Rico which certain Class members attended at the sole expense of the Sex Trafficking Enterprise, who funded the private jet travel expenses and luxurious lodging accommodations.

115. Prior to leaving for the trip and during the duration of the trip itself, multiple Class members were immediately subjected to grotesque sexual batteries which have continued to cause them severe emotional distress and trauma.

116. The aforementioned conduct is referred to as the "SEX TRAFFICKING CRIMES."

## C. Specific Examples of Transactions Facilitated by BARCLAYS in Furtherance of the SEX TRAFFICKING CRIMES

117. The perpetration of the SEX TRAFFICKING CRIMES by the Sex Trafficking Enterprise was made possible only through the vast expanse of

financial resources held by the members of the Enterprise, with the enablement and support of the STRATEGIC PARTNER DEFENDANTS.

118.    While many of the victims of the SEX TRAFFICKING CRIMES were compensated with cash, a vast paper trail of financial transactions also exists. To this end, the STRATEGIC PARTNER DEFENDANTS knowingly enabled the perpetration of the SEX TRAFFICKING CRIMES through their facilitation of countless transactions conducted in furtherance of the SEX TRAFFICKING CRIMES.

119.    By way of example, the following chart illustrates a sample of some of the incipient and precipitating transactions involving Commercial Sex Acts perpetrated by members of the Sex Trafficking Enterprise and facilitated by BARCLAYS:

| Date of Transaction | Description of Transaction | Role of BARCLAYS | Amount (in USD) |
|---|---|---|---|
| September 12, 2016 | Payment by Sierra to Class members | Originating Bank | $50,000.00 |
| September 15, 2016 | Payment by Sierra to Class members | Originating Bank | $17,050.00 |
| October 17, 2016 | Travel expenses paid by members of Sex Trafficking Enterprise for Class members | Originating Bank | $89,998.46 |
| January 19, 2017 | Payment by Aaron Simpson to Class members | Originating Bank | $4,000.00 |
| January 25, 2017 | "Payment by Aaron Simpson to Class members | Originating Bank | $4,000.00 |

| January 31, 2017 | Lodging expenses paid by members of Sex Trafficking Enterprise for Class members | Originating Bank | $4,061.69 |
|---|---|---|---|
| March 31, 2017 | Payment by Aaron Simpson to Class members | Originating Bank | $2,149.47 |
| April 18, 2017 | Payment by Aaron Simpson to Class members | Originating Bank | $7,500.00 |
| April 20, 2017 | Payment by Aaron Simpson to Class members | Originating Bank | $9,999.00 |
| May 16, 2017 | Payment by Dahar to Class members | Originating Bank | $10,225.97 |
| August 8, 2017 | Payment by Quintessentially to Class members | Originating Bank | $28,907.00 |
| July 13, 2017 | Lodging expense paid by Quintessentially for Class members | Originating Bank | $242.41 |
| December 2016 | Leasing expenses paid by members of Sex Trafficking Enterprise for Class members | Originating Bank | $35,550.00 |
| December 2016 | Transportation expenses paid by members of Sex Trafficking Enterprise for Class members | Originating Bank | $5,772.00 |
| December 2016 | Travel expenses paid by members of Sex Trafficking Enterprise for Class members | Originating Bank | $785.84 |

| December 2016 | Travel expenses paid by members of Sex Trafficking Enterprise for Class members | Originating Bank | $728.66 |
|---|---|---|---|
| December 2016 | Travel expenses paid by members of Sex Trafficking Enterprise for Class members | Originating Bank | $449.48 |
| December 2016 | Travel expenses paid by members of Sex Trafficking Enterprise for Class members | Originating Bank | $558.35 |
| December 2016 | Travel expenses paid by members of Sex Trafficking Enterprise for Class members | Originating Bank | $562.10 |

**D. Additional Illustrations of BARCLAYS' Facilitation of Specific Transactions in Furtherance of the SEX TRAFFICKING CRIMES**

120.    In addition to the aforementioned transactions, the Sex Trafficking Enterprise arranged for and funded transportation and lodging expenses specifically incurred for the perpetration of numerous Commercial Sex Acts perpetrated by members of the Sex Trafficking Enterprise and facilitated by BARCLAYS. By way of example, the following chart illustrates a sample of such transactions:

| Date of Booking | Description of Booking |
|---|---|
| July 25, 2017 | Car rental for Class members |
| June 11, 2017 | Car rental for Class members |

| July 5, 2017 | Car rental for Class members |
|---|---|
| April 13, 2017 | Car rental for Class members |
| April 4, 2017 | Car rental for Class members |
| February 12, 2017 | Car rental for Class members |
| September 8, 2017 | Car rental for Class members |
| June 11, 2017 | Flight booking for Class members |
| June 12, 2017 | Flight booking for Class members |
| June 16, 2017 | Flight booking for Class members |
| June 22, 2017 | Flight booking for Class members |
| June 22, 2017 | Flight booking for Class members |
| September 8, 2017 | Flight booking for Class members |
| August 9, 2017 | Flight booking for Class members |
| July 18, 2017 | Flight booking for Class members |
| July 20, 2017 | Flight booking for Class members |
| June 22, 2017 | Flight booking for Class members |
| June 22, 2017 | Flight booking for Class members |
| August 18, 2017 | Flight booking for Class members |
| August 18, 2017 | Flight booking for Class members |
| July 11, 2017 | Flight booking for Class members |
| June 5, 2017 | Flight booking for Class members |
| June 5, 2017 | Flight booking for Class members |

| | |
|---|---|
| August 9, 2017 | Flight booking for Class members |
| April 13, 2017 | Flight booking for Class members |
| April 13, 2017 | Flight booking for Class members |
| April 24, 2017 | Flight booking for Class members |
| March 16, 2017 | Flight booking for Class members |
| March 19, 2017 | Flight booking for Class members |
| March 4, 2017 | Flight booking for Class members |
| February 27, 2017 | Flight booking for Class members |
| February 12, 2017 | Flight booking for Class members |
| January 8, 2017 | Flight booking for Class members |
| January 14, 2017 | Flight booking for Class members |
| April 7, 2017 | Flight booking for Class members |
| September 25, 2016 to October 2, 2016 | Hotel booking for Class members |

## III.

## THE FINANCIAL CRIMES

### A. Introduction to the FINANCIAL CRIMES Enabled and Facilitated by the STRATEGIC PARTNER DEFENDANTS

121. "**We can't give the fucking thing to the government**." Author: Elliot.

122. It has been well-publicized that Elliot, Simpson, Birns, and Drummond have supervised the movement of money between the UK and foreign countries throughout the operations of the Quintessentially Entities.

123. Perhaps what is lesser known is that, in addition to the SEX TRAFFICKING CRIMES described above, the Quintessentially Directors have utilized the corporate forms of shell entities to commit egregious financial crimes over international waters.

124. By way of example, the Quintessentially Directors utilized at least four "shell" entities—Secure Live Media LTD ("Secure"), [13] Materia Entertainment LLC (Materia), MMVM Development Inc. ("MMVM"), [14] and Sierra Industries Limited, formerly known as Peachy Teddy Limited ("Sierra")—which were all controlled, administrated, and funded by members of the Sex Trafficking Enterprise and the Quintessentially Co-Conspirators, and used as tax evasion and money laundering shells of the Quintessentially Entities, including through payments received from MFCXY, Inc.[15]

125. Importantly, Simpson was instrumental in facilitating the opening of Plaintiff's BARCLAYS account. To this end, Simpson represented to BARCLAYS that the account was being established for a holding company which would be utilized as "an investment vehicle into a USA subsidiary." Further, Hassan conveyed to BARCLAYS that subsidiary was in the business of "software

---

[13] On information and belief, Secure Live Media LTD was dissolved on or about January 23, 2024.

[14] The address of the incorporator contained in MMVM's certification of incorporation is: 515 West 20th St., Suite 6W, New York, NY 10011 – the same address as Quintessentially's New York office.

[15] Ironically, MFCXY, Inc.—which serves as a holding company for adult websites OnlyFans and MyFreeCams, and is backed by American businessman Leonid Radvinsky—has been flagged in multiple Suspicious Activity Reports concerning suspicious transactions and the facilitation of platforms to "underage children, and other vulnerable individuals [who] might be forced to provide services." https://thedeepdive.ca/fbi-opens-investigation-into-onlyfans-financial-activity-over-potential-crimes/

development . . . for salesforce widgets." These representations were demonstrably false at the time they were made, and BARCLAYS failed to conduct any appropriate due diligence or otherwise take even minimal measure to confirm the accuracy of these representations. Indeed, BARCLAYS' acceptance of the conveyed business purpose being "salesforce widgets" is remarkable in and of itself.

126. In addition, no due diligence was conducted into the identity of Plaintiff or Plaintiff's relationship with Simpson prior to the establishment of this account. Likewise, no due diligence was conducted into the identity or involvement of any other California resident whose personal identifying information was used to establish the account.

127. Ultimately, the account was hastily and recklessly opened—and immeasurably exploited—serving as the necessary instrumentality by which the perpetration of the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES could not have otherwise occurred.[16]

---

[16] BARCLAYS was fined £72,069,400.00 in November of 2015 for facilitating essentially the same conduct. Pursuant to the November 2015 final notice released by the FCA, "[i]t is the responsibility of UK financial institutions to ensure that they minimise the risk of being used for criminal purposes and, in particular, of facilitating money laundering," which the FCA found BARCLAYS failed to do. *See* https://www.fca.org.uk/publication/final-notices/barclays-bank-nov-2015.pdf.

In addition, as noted above, approximately ten years later the FCA fined BARCLAYS again for failing to take appropriate measures to minimize the risks of its customers using its resources to facilitate similar financial crimes. As it has done in the recent past, in establishing the banking relationships with Plaintiff and the other California residents to appease Simpson and other members of the Sex Trafficking Enterprise, BARCLAYS went to "unacceptable lengths to accommodate [its] clients," including failing to obtain information "that it was required to obtain from the clients to comply with financial crime requirements."

128.   Secure, Materia, MMVM, and Sierra are collectively referred to as the "Shell Entities." At all relevant times herein, the Shell Entities held one or more bank accounts with BARCLAYS.

**B. Specific Illustrations of the Criminal Acts and Unlawful Conduct Committed in Furtherance of the FINANCIAL CRIMES**

**1. Tax Fraud Crimes**

129.   The Sex Trafficking Enterprise and the Quintessentially Co-Conspirators used Sierra as a means of improperly receiving tax relief pursuant to two UK tax initiatives—the Seed Enterprise Investment Scheme (SEIS) and the Enterprise Investment Scheme (EIS).

130.   Moreover, on information and belief, Uttah was incorporated and given ownership in the Shell Entities for the sole purposes of insulating the liability of the Sex Trafficking Enterprise and the Quintessentially Co-Conspirators, and to provide a tax haven for the Sex Trafficking Enterprise and the Quintessentially Co-Conspirators to exploit while feigning compliance with SEIS and EIS initiatives.

131.   In this regard, the Sex Trafficking Enterprise and the Quintessentially Co-Conspirators' systematic abuses have extended to the commission of Tax Fraud Crimes by engaging in at least the following conduct:

   a) Intentionally misrepresenting the true purpose of their purported investments into and through the Shell Entities for purposes of qualifying for SEIS and EIS UK tax relief under false pretenses;

   b) Feigning that their purported investments in Sierra were of actual benefit to "start-up" companies—namely, Materia and MMVM—in order to contrive eligibility for SEIS and EIS UK tax relief;

*See* https://www.fca.org.uk/news/press-releases/fca-fines-barclays-%C2%A372-million-poor-handling-financial-crime-risks.

c) Depositing monies into Sierra's UK-based bank account and then subsequently causing those monies to be transferred to MMVM's California-based bank account in order to feign the appearance that said deposits qualified for relief in accordance with UK tax incentive requirements;

d) Causing purported investment monies to be transferred to one or more of the Shell Entities in an effort to simulate the appearance of legitimately conducted transactions, only to cause said monies to be funneled back to one or more of the Sex Trafficking Enterprises members or the Quintessentially Co-Conspirators to conceal the true origins of the funds and the purposes for which the funds were actually being transmitted;

e) Intentionally laundering their investments through Utahh for purposes of avoiding tax liability and FATCA reporting requirements;

f) Assisting in the formation and operation of foreign "affiliates" of Quintessentially—including, Quintessentially Adriatic, Quintessentially Nova LLC, Apple Concierge LLC, APCG LLC, and APCG Rus LLC—to facilitate the concealment of proceeds earned from illicit operations including the SEX TRAFFICKING CRIMES;

g) Doctoring relevant corporate records to evade taxes, launder money, and avoid legal obligations; and

132. Signing and/or verifying dispositive corporate documents, misappropriating the names of various Quintessentially employees without their knowledge or consent. The aforementioned conduct is hereinafter referred to as the "Tax Fraud Crimes."

**2. Money Laundering Schemes**

133.    On information and belief, in addition to the Tax Fraud Crimes, the Sex Trafficking Enterprise and the Quintessentially Co-Conspirators acted in concert to devise Money Laundering Schemes to wash illicitly obtained monies earned at least in part from the SEX TRAFFICKING CRIMES and to launder payments from their clientele for illicit services in furtherance of the SEX TRAFFICKING CRIMES. One such scheme involved the Quintessentially Directors and the Quintessentially Co-Conspirators acting in concert to direct Plaintiff and certain employees of the Quintessentially Entities to recycle monies purportedly invested in the Shell Entities  back to certain members of the Sex Trafficking Enterprise and/or the Quintessentially Co-Conspirators, not only to conceal the origin of such monies, but also to feign that such monies were actually invested in these entities.

134.    The Sex Trafficking Enterprise and the Quintessentially Co-Conspirators' Money Laundering Schemes included at least the following transactions and conduct:

    a) Enlisting naïve victims to unknowingly enable and facilitate the transmission of monies to Class members received in exchange for Commercial Sex Acts that were procured by force, threats of force, fraud, or coercion;

    b) Using accounts held by the Shell entities in this District to cause the transmission of laundered monies used to pay for Commercial Sex Acts that were procured by force, threats of force, fraud, or coercion;

    c) Recruiting Plaintiff and other victims to transmit monies to one or more of the Shell Entities—whose bank accounts were maintained in this District—and then causing the monies to be sent back to one of

their personal accounts, with the design to conceal the true nature of the transaction and origin of the funds. Such funds would be sent in increments of, by way of example, $142,000.00 and $60,000.00;

d) Diverting funds from the Quintessentially Co-Conspirators into one of the U.S. based Shell Entities' accounts maintained in this District for the purpose of avoiding detection and financing the SEX TRAFFICKING CRIMES;

e) Utilizing Uttah, formed in the British Virgin Islands, to funnel monies without detection and conceal the origins of certain funds;

f) Directing Plaintiff and other victims to  facilitate the transmission of monies through accounts held in this District to accounts established in countries such as Mauritius that were used as end-deposit "tax havens" with the purpose of further concealing gains and avoiding tax liability and FATCA reporting requirements; and

g) Misappropriating and forging individuals' identities and signatures without their knowledge, for purposes of establishing sham entities, masking the origins of monies funneled through such entities, and evading tax authorities.

135.   The aforementioned conduct is hereinafter referred to as the "Money Laundering Schemes." On information and belief, such conduct was orchestrated by the Sex Trafficking Enterprise with the intent of shielding its members from liability.

136.   The Tax Fraud Crimes and the Money Laundering Schemes shall be collectively referred to as the "FINANCIAL CRIMES."

137.   Plaintiff is well informed that the Sex Trafficking Enterprise and the Quintessentially Co-Conspirators continue to perpetrate the SEX TRAFFICKING

CRIMES and FINANCIAL CRIMES through the manipulation and victimization of the young females and males who have fallen victim to their cycle of corruption.

138.    As set forth below, BARCLAYS, by and through STALEY, was well aware of such criminal acts and unlawful conduct of the Sex Trafficking Enterprise, yet failed to extricate itself from any involvement in the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES. Moreover, as further set forth below, the STRATEGIC PARTNER DEFENDANTS went so far as to support, facilitate, and otherwise participate in the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES, and were able to reap the benefits of their criminal aiding and abetting.

## C. Specific Examples of Transactions Facilitated by BARCLAYS in Furtherance of the FINANCIAL CRIMES

139.    As described herein, the perpetration of the FINANCIAL CRIMES by the Sex Trafficking Enterprise was made possible only through the vast expanse of financial resources held by the members of the Enterprise, with the enablement and support of the STRATEGIC PARTNER DEFENDANTS.

140.    By way of example, the following chart illustrates a sample of some of the incipient and precipitating transactions facilitated by the STRATEGIC PARTNER DEFENDANTS in furtherance of the FINANCIAL CRIMES:

| Date of Transaction | Description of Transaction | Role of BARCLAYS | Amount (in USD) |
|---|---|---|---|
| April 4, 2016 | Transfer between members of Sex Trafficking Enterprise | Beneficiary Bank | $142,676.00[17] |

---

[17] Equating to 100,000.00 GBP at time of transfer.

| April 4, 2016 | Transfer between members of Sex Trafficking Enterprise | Originating Bank | $142,676.00[18] |
|---|---|---|---|
| May 12, 2016 | Transfer from Sierra to MMVM | Originating Bank | $60,217.00 |
| May 12, 2016 | First same day transfer to Sierra referencing "SEIS" | Beneficiary Bank | $14,443.00[19] |
| May 12, 2016 | Second same day transfer to Sierra referencing "SEIS" | Beneficiary Bank | $14,443.00[20] |
| May 12, 2016 | Third same day transfer to Sierra referencing "SEIS" | Beneficiary Bank | $14,443.00[21] |
| May 12, 2016 | Fourth same day transfer to Sierra referencing "SEIS" | Beneficiary Bank | $14,443.00[22] |

[18] Equating to 100,000.00 GBP at time of transfer, just prior to close of the fiscal tax year in the UK.
[19] Equating to 10,000.00 GBP at time of transfer.
[20] Equating to 10,000.00 GBP at time of transfer.
[21] Equating to 10,000.00 GBP at time of transfer.
[22] Equating to 10,000.00 GBP at time of transfer.

| May 12, 2016 | Fifth same day transfer to Sierra referencing "SEIS" [23] | Beneficiary Bank | $14,443.00[24] |
|---|---|---|---|
| August 10, 2016 | First same day transfer to Sierra | Beneficiary Bank | $11,319.57 |
| August 10, 2016 | Second same day transfer to Sierra | Beneficiary Bank | $13,011.00[25] |
| August 10, 2016 | Third same day transfer to Sierra | Beneficiary Bank | $13,011.00[26] |
| August 10, 2016 | Fourth same day transfer to Sierra[27] | Beneficiary Bank | $13,011.00[28] |
| August 11, 2016 | Transfer between members of Sex Trafficking Enterprise | Originating Bank | $50,000.00 |
| September 4, 2016 | Payment from Richard Stockton to Sierra | Beneficiary Bank | $33,257.50 |
| September 5, 2016 | Payment from Aaron Simpson to Sierra | Beneficiary Bank | $33,267.50 |

[23] Title 7, Chapter 10 of the California Penal Code prescribes Money Laundering transactions. CA Penal Code § 186.10 prohibits individuals from engaging in financial transactions that promote, manage, establish, carry on, or facilitate criminal activity. Additionally, CA Penal Code § 14166 criminalizes willful violations of reporting requirements for transactions involving monetary instruments, especially when those transactions are connected to criminal activity.

[24] Equating to 10,000.00 GBP at time of transfer.

[25] Equating to 10,000.00 GBP at time of transfer.

[26] Equating to 10,000.00 GBP at time of transfer.

[27] See Footnote 21.

[28] Equating to 10,000.00 GBP at time of transfer.

| September 7, 2016 | Transfer between members of Sex Trafficking Enterprise | Originating Bank | $50,000.00 |
|---|---|---|---|
| September 7, 2016 | Payment from Emir Eskihancilar to Sierra | Beneficiary Bank | $66,705.00 |
| November 25, 2016 | Payment from Ramsey Mankarious to Sierra | Beneficiary Bank | $31,015.00 |
| November 25, 2016 | Transfer between members of Sex Trafficking Enterprise | Originating Bank | $50,000.00 |
| December 28, 2016 | Payment from Aaron Simpson to Sierra | Beneficiary Bank | $32,398.11 |
| December 28, 2016 | Transfer between members of Sex Trafficking Enterprise | Originating Bank | $35,000.00 |
| February 28, 2017 | Transfer between members of Sex Trafficking Enterprise | Originating Bank | $40,000.00 |
| March 7, 2017 | Payment from Bozetto Limited to Sierra | Beneficiary Bank | $30,508.75 |
| March 7, 2017 | Transfer between members of Sex Trafficking Enterprise | Originating Bank | $30,000.00 |
| March 20, 2017 | Transfer between members of Sex Trafficking Enterprise | Originating Bank | $35,000.00 |

| March 23, 2017 | Payment from Setai Investments FZE to Sierra | Beneficiary Bank | $62,582.50 |
|---|---|---|---|
| April 5, 2017 | Payment from John Edward Day to Sierra (referencing Quintessentially) | Beneficiary Bank | $250,521.65 |
| June 27, 2017 | Transfer between members of Sex Trafficking Enterprise | Originating Bank | $72,578.60 |
| June 28, 2017 | Transfer between members of Sex Trafficking Enterprise | Originating Bank | $59,585.40 |

141. Despite falling egregiously short of meeting the criteria for qualification under both the SEIS and EIS investment schemes, the Sex Trafficking Enterprise was able to utilize Sierra—among other members—to exploit those schemes and unlawfully obtain tax benefits year after year, made possible through the enabling and facilitating conduct of BARCLAYS.

142. Moreover, the Sex Trafficking Enterprise utilized Sierra and other Shell Entities to launder monies in furtherance of the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES, as further set forth below. BARCLAYS was fundamental in these efforts in serving as the ever-reliable conduit through which the unlawful transactions were enabled and facilitated.

//

//

//

## IV.

## THE STRATEGIC PARTNER DEFENDANTS' PIVOTAL ROLE IN THE PERPETRATION OF THE SEX TRAFFICKING CRIMES AND FINANCIAL CRIMES

### A. STALEY's Intimate Knowledge and Preexisting Relationship with the Sex Trafficking Enterprise and Jeffrey Epstein

143. STALEY had a personal relationship with multiple members of the Sex Trafficking Enterprise that predated and precipitated the banking relationship with the STRATEGIC PARTNER DEFENDANTS. In fact, STALEY attended many of the above-described sex parties hosted by the Sex Trafficking Enterprise prior to his tenure with BARCLAYS.

144. STALEY's knowledge of the SEX TRAFFICKING CRIMES was not only actual; it was intimate and cultivated over time. His attendance and participation in the Sex Trafficking Enterprise's festivities—events at which the fraudulently coerced (and in some cases forced) Commercial Sex Acts and sexual abuses of many young females and males were prevalent and pervasive—is direct evidence of his intimate knowledge and insight into the nature and extent of the SEX TRAFFICKING CRIMES that preexisted the STRATEGIC PARTNER DEFENDANTS' business relationship with the Sex Trafficking Enterprise.

145. In fact, STALEY's knowledge of the intricacies of Sex Trafficking Ventures extends beyond his longstanding relationship with the Sex Trafficking Enterprise. In this regard, STALEY was a longtime friend of known sex offender and Sex Trafficker Jeffrey Epstein, a friendship that dates back to at least 1999. STALEY—as well as Epstein—shared not only friendships with members of the Sex Trafficking Enterprise, but were also recurring clients of Quintessentially.

146. Indeed, STALEY has publicly referred to Epstein as one of his "deepest" and "most cherished" friends, further demonstrating that he had few friendships as "profound" as his relationship with Epstein. In fact, STALEY had visited Epstein's various properties—including the notorious Little Saint James Island—on a multitude occasions, even prior to assuming his executive position at BARCLAYS. Even further, STALEY travelled to Florida to visit Epstein during the latter's 2009 prison sentence for soliciting and procuring a minor for prostitution.

147. In addition to being close friends, STALEY and Epstein were also business associates. Throughout STALEY's professional career, Epstein would introduce him to prominent figures in the financial services industry. Moreover, Epstein actively lobbied for STALEY's candidacy as CEO of BARCLAYS.

148. STALEY's longstanding and publicly dissected relationship with Epstein not only further corroborates his profound familiarity with sex offenders and sex crimes; it exemplifies his predisposition to participate in such crimes long before his tenure with BARCLAYS.

149. By virtue of his executive position as CEO of BARCLAYS, at all times relevant herein, BARCLAYS not only had constructive knowledge of STALEY's alignment and alliances with the Sex Trafficking Enterprise and Jeffrey Epstein; its actual knowledge and insight into the SEX TRAFFICKING CRIMES is necessarily established.

//

//

//

//

//

**B. The STRATEGIC PARTNER DEFENDANTS' Active Participation in the Criminal Acts and Unlawful Conduct of the Sex Trafficking Enterprise**

150. In or around 2015, in furtherance of the Sex Trafficking Enterprise's criminal acts and unlawful conduct, the Quintessentially Directors discerned the importance of establishing a relationship with a reputable financial institution to:

    a) Legitimize the appearance of the Quintessentially Entities' criminal operations;

    b) Establish and administer accounts for illegitimate sham companies;

    c) Facilitate financial transactions intended to launder monies;

    d) Sanction electronic transfers of ill-gotten monies intended to evade tax reporting requirements;

    e) Disregard federal banking laws including FATCA reporting requirements;

    f) Willfully ignore red flag indicators of unlawful activity; and

    g) Otherwise enable the financial underpinnings of the Sex Trafficking Enterprise's criminal acts and unlawful conduct.

151. By virtue of their preestablished relationships, the Quintessentially Directors knew that STALEY—newfound CEO of BARCLAYS and publicly known associate of Jeffrey Epstein—was the perfect person to accomplish these illicit objectives. As set forth below, the Quintessentially Directors certainly made the right choice with the STRATEGIC PARTNER DEFENDANTS to accomplish these objectives, particularly because they took active efforts to make material misrepresentations and fraudulent concealments to governing regulators and agencies that allowed for the Sex Trafficking Enterprise to continue its

operations—and even further—they knowingly engaged in conduct that enabled and facilitated the criminal acts and unlawful conduct of the Enterprise.

152.    BARCLAYS, by and through its executives and employees, including STALEY, knowingly and intentionally supported, facilitated, and otherwise participated in in the Sex Trafficking Enterprise's perpetration of the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES. Predominately, BARCLAYS provided the necessary financial frameworks and services—in addition to turning a blind eye to the criminal acts and unlawful conduct described below—for the Sex Trafficking Enterprise to discretely fund and operate the SEX TRAFFICKING CRIMES. In addition, BARCLAYS enabled and facilitated the FINANCIAL CRIMES, which necessarily helped to further the SEX TRAFFICKING CRIMES, as further described below.

153. However, as set forth above, the STRATEGIC PARTNER DEFENDANTS' conduct went far beyond such aiding and abetting, transcending to actively participating in the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES, including by virtue of executives like STALEY conspicuously engaging in Commercial Sex Acts themselves, along with the likes of the Quintessentially Directors and Sex Trafficking Enterprise Patrons.

154.    Only with the aiding and abetting and active participation of the STRATEGIC PARTNER DEFENDANTS—and utilization of their vast facilities and instrumentalities—could the global expansion envisioned by the Sex Trafficking Enterprise be achieved. STALEY was the linchpin and catalyst to the grand union between BARCLAYS and the Sex Trafficking Enterprise, which enabled the Enterprise to systematically perpetrate the SEX TRAFFICKING CRIMES against Plaintiff and all other similarly situated young females and males.

155.    In addition, the STRATEGIC PARTNER DEFENDANTS were in the strategic position of having vast resources and institutional wherewithal at their disposal, which allowed them to enable and facilitate the FINANCIAL CRIMES for the Sex Trafficking Enterprise. The likes of STALEY were in the unique position of being able to partake in the fruits of these criminal enterprises.

156.    The Strategic Partnership between the Sex Trafficking Enterprise and the STRATEGIC PARTNER DEFENDANTS was—by all accounts of those who have been privy to the relationship—mutually beneficial and promoting. Not only did the Sex Trafficking Enterprise conduct the majority of its banking business with BARCLAYS; the global contacts cultivated by the Enterprise—especially Elliot—allowed for them to introduce and recruit wealthy individuals—including members of the Sex Trafficking Enterprise Patrons and other associates—to also bank with BARCLAYS, who thereby benefited even more exponentially from the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES.

157.    On information and belief, STALEY, already predisposed to the facilitation of Sex Trafficking Ventures (and having personally participated in and enjoyed the fruits of those Ventures) through his well-publicized relationship with Jeffrey Epstein, zealously safeguarded the Sex Trafficking Enterprise from exposure to liability for the FINANCIAL CRIMES they committed. Such protective measures taken in conjunction with BARCLAYS' provision of the financial underpinnings also made for the perfect synergic relationship that enabled the Sex Trafficking Enterprise to effectuate its SEX TRAFFICKING CRIMES.

158.    By and through the STRATEGIC PARTNER DEFENDANTS' complicities, the Sex Trafficking Enterprise was empowered to perpetrate the SEX TRAFFICKING CRIMES against Plaintiff and the other members of the Class, without apprehension of legal or fiscal culpability. The Sex Trafficking Enterprise

utilized the essential support of BARCLAYS—a renowned and reputable financial institution—to veil their ever-expanding criminal activities.

159. Specifically, on information and belief, the STRATEGIC PARTNER DEFENDANTS knowingly and complicitly engaged in the following unlawful conduct in furtherance of the Sex Trafficking Enterprise's criminal Ventures:

a) Establishing numerous accounts of the Sex Trafficking Enterprise, including for the Shell Entities and individual members of the Enterprise, and facilitating electronic transfers of monies to Plaintiff and other members of the Class through accounts held in this District for their compliance with the sexual abuses and sexual services provided to—among others—the Sex Trafficking Enterprise Patrons—which further incentivized their continued complicity with the SEX TRAFFICKING CRIMES;

b) Falsely indicating that members of the Sex Trafficking Enterprise were "fully KYC'd" in order to pass regulatory muster and enable the establishment of such accounts;

c) Through STALEY's unfettered support of the Sex Trafficking Enterprise by virtue of his position as BARCLAYS' CEO, not only enabling and facilitating the Sex Trafficking Enterprise's criminal Ventures; but actively participating in the grotesque, barbarous, and dehumanizing acts perpetrated by the Enterprise and its Patrons;

d) Otherwise advancing the SEX TRAFFICKING CRIMES notwithstanding their actual knowledge—through the likes of STALEY—that the bank accounts and monetary transactions used to enable and finance the sex parties and the Sex Trafficking Enterprise's payments to were held and facilitated by BARCLAYS;

e) Providing depository and clearing house services for many of the illegitimate Quintessentially Entities, which were formed and operated as alter egos of Quintessentially and the Quintessentially Directors;

f) Providing depository and clearing house services to numerous other illegitimate corporate entities controlled by the Sex Trafficking Enterprise, including the Shell Entities, which were utilized by the Enterprise to further the Tax Fraud Crimes and Money Laundering Schemes that provided the pivotal financial underpinnings to enable and facilitate the SEX TRAFFICKING CRIMES;

g) Aiding and abetting the Sex Trafficking Enterprise's Shell Entities in the commission of their Tax Fraud Crimes to obtain qualification for SEIS and EIS UK tax relief under false pretenses;

h) Providing other financial underpinnings necessary for the Sex Trafficking Enterprise to successfully recruit, entice, harbor, transport, provide, obtain, and otherwise solicit Plaintiff and other members of the Class to precipitate their complicity in Commercial Sex Acts; and

i) Aiding and abetting the Tax Fraud Crimes and Money Laundering Schemes of the Sex Trafficking Enterprise by facilitating the transfers of the Enterprise's ill-gotten monies through various offshore sham entities—including the Shell Entities—controlled by the Enterprise.

160. Particularly with STALEY's unfettered support, the Sex Trafficking Enterprise knew that the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES committed in furtherance of the Sex Trafficking Enterprise's criminal Ventures would be safeguarded by BARCLAYS.

161. Contemporaneously with STALEY joining BARCLAYS, his longstanding relationship with known sex offender and Sex Trafficker Jeffrey Epstein—and participation in Epstein's Sex Trafficking Ventures—came to public light. As further discussed below, BARCLAYS was made aware of STALEY's relationship with Epstein prior to STALEY officially assuming the role of CEO at BARCLAYS, and despite such knowledge, BARCLAYS not only stood by STALEY—who remained steadfast in his support of the Sex Trafficking Enterprise's criminal conduct—but actively defended him and continued his executive employment with BARCLAYS, which had far too much to lose if STALEY departed.

162. On information and belief, in or around November of 2021, BARCLAYS and STALEY finally cut ties due to the unignorable publicity surrounding the relationship between STALEY and Jeffrey Epstein, as well as in response to the findings of an investigation by the U.K.'s Financial Conduct Authority (FCA) and the Prudential Regulation Authority (PRA) into STALEY's relationship with Epstein, as further discussed below.[29]

163. On further information and belief, shortly after BARCLAYS and STALEY's separation, the Sex Trafficking Enterprise also cut ties with BARCLAYS.

//

//

//

---

[29] In or around July of 2025 the Upper Tribunal upheld Staley's ban from holding senior management roles in the financial services industry. *See* https://www.fca.org.uk/news/press-releases/upper-tribunal-upholds-jes-staley-ban.

## C. <u>BARCLAYS' Enablement and Facilitation of the Criminal Acts and Unlawful Conduct Perpetrated by the Sex Trafficking Enterprise</u>

164.    The Shell Entities, particularly Sierra, were each formed without a cognizable corporate purpose. To this end, it is a factual certainty that Sierra—despite indicating on its application to BARCLAYS that the nature of its business was "software development"—never actually conducted any business activities other than financing the SEX TRAFFICKING CRIMES and furthering the FINANCIAL CRIMES.

165.    The establishment of Sierra's BARCLAYS account alone should have raised a wide breadth of questions, with which BARCLAYS not only dispensed, but, as set forth below, willfully turned a blind eye, in furtherance of its enablement and facilitation of the Sex Trafficking Enterprise's criminal acts.

166.    In this regard, in or around March of 2016, representatives of the Quintessentially Entities corresponded with BARCLAYS personnel in continuation of the former's efforts to establish Sierra's BARCLAYS account. Throughout the course of this correspondence, Quintessentially personnel made a multitude of demonstrably false representations which BARCLAYS should have reasonably discovered had it conducted any due diligence. In fact, BARCLAYS blindly accepted objectively ludicrous statements from Quintessentially personnel to establish this account. Such statements included the following:

      a) That Sierra was developing software "for Salesforce Widgets";

      b) That Sierra was to be used as "an investment vehicle into a USA subsidiary";

      c) That the chances of Sierra "being involved in anything nefarious is extremely unlikely";

d) That the Quintessentially Entities were in no way involved with Sierra—which is exceptionally ludicrous given that all emails to BARCLAYS came from individuals utilizing "@quintessentially.com" email addresses; and

e) That Aaron Simpson was familiar with an individual he was using as a pawn to establish the account through an unconfirmed "3 years [of] business networking."

167. Had BARCLAYS conducted any appropriate investigation—or any investigation whatsoever—into the veracity of such statements, BARCLAYS would have almost immediately discerned the nefarious nature of Sierra's true "business" purpose, and the criminal activities for which the Sierra account would be used.

168. Despite these objectively clear misrepresentations, one truth did emerge from this cursory exchange, to wit, that because the "Quintessentially Group [was] well known to Barclays," they were immunized from the basic due diligence protocols that were incumbent on BARCLAYS and thus able to freely establish such accounts without any level of scrutiny.[30]

169. By way of example, on or around June 23, 2017, a payment through the Sierra BARCLAYS account was attempted by certain members of the Sex Trafficking Enterprise in the amount of approximately $286,938.80.

170. Initially, the payment was attempted to be delivered through a third-party "electronic money services provider." Said financial intermediary immediately flagged this transaction and contacted Aaron Simpson, stating that

---

[30] In fact, the Quintessentially Entities held well over 50 BARCLAYS accounts through which their SEX TRAFFICKING CRIMES and FINANCIAL CRIMES were enabled and facilitated without any oversight.

they were "legally obliged to check the source of wealth and confirm the reason for [the] payment." Specifically, the financial intermediary inquired into "the activities of [Sierra]." Not surprisingly, the financial intermediary was never provided with any adequate explanation.

171. Following the aforementioned financial institution's refusal to facilitate this transaction, the members of the Sex Trafficking Enterprise turned to BARCLAYS to enable the transaction—to which BARCLAYS immediately obliged—despite objectively clear indications, as identified by Wise, that the transaction reeked of criminality.

**D. Specific Facts and Events Additionally Establishing BARCLAYS' Actual Knowledge of STALEY's and the Sex Trafficking Enterprise's Criminal Acts and Unlawful Conduct**

172. As set forth above, by virtue of STALEY's position as CEO of BARCLAYS—as well as those he recruited—BARCLAYS acquired intimate knowledge and insight into the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES.

173. In addition to such actual knowledge, BARCLAYS should have known of both STALEY's and the Sex Trafficking Enterprise's propensities to engage in the very criminal acts and unlawful conduct committed during STALEY's tenure with BARCLAYS. In this regard, widespread proclamations of both STALEY and the Sex Trafficking Enterprise's propensities for engaging in such illicit practices demonstrate not only that BARCLAYS at the very minimum had Constructive Knowledge of such; they demonstrate that BARCLAYS recklessly disregarded obvious red flags and even went so far as to actively attempt to insulate STALEY from public scrutiny and defend him in regulatory discipline proceedings.

174. By way of further example, BARCLAYS was on actual and/or constructive notice of STALEY's illicit practices and propensities by virtue of the following publicized facts and events, which occurred both prior to and during his executive position with BARCLAYS:

    a) In 2015, prior to STALEY assuming his role as CEO of BARCLAYS, BARCLAYS was not only formally notified of the intimate preexisting relationship between STALEY and Epstein; the FCA launched an inquiry into that relationship,[31] in response to which BARCLAYS not only actively defended STALEY; it went so far as to knowingly misrepresent the nature and extent of his relationship with Epstein despite having clear evidence to the contrary;

    b) Even after STALEY assumed his executive position with BARCLAYS, the FCA and PRA launched an investigation into the relationship between STALEY and Epstein after approximately 1,200 emails detailing their Sex Trafficking Ventures were shared by JPMorgan with UK regulators. Nevertheless, BARCLAYS continued its support and defense of STALEY, and maintained his executive employment for years thereafter;

    c) STALEY—in his role as Chief Executive of BARCLAYS—was also fined £642,430.00 by the FCA and the PRA for failing to act with due skill, care, and diligence in response to an anonymous letter received by BARCLAYS in June 2016, which contained allegations of misconduct against STALEY. In this regard, STALEY wrongfully attempted to identify the author of the anonymous letter in blatant

---

[31] Indeed, STALEY was one of the more prominent figures whose name appeared in Epstein's "Little Black Book."

disregard of whistleblower procedures and protections, a violation which BARCLAYS not only did nothing about, but also failed to investigate the underlying allegations;[32] and

d) During his employment, STALEY participated in a well-documented multitude of double-dealing business decisions and self-serving financial transactions.[33]

175. In addition, prior to engaging them as clients, BARCLAYS should have at the very minimum been on notice of the Sex Trafficking Enterprise's illicit practices and propensities by virtue of at least the following publicized facts and events:

a) Epstein and Ghislaine Maxwell's attendance at a multitude of Quintessentially events, at which their participation in various Sex Trafficking Ventures was publicly observed;

b) The extent of the professional and social relationships that existed between Jeffrey Epstein and certain members of the Sex Trafficking Enterprise;

c) Quintessentially's publicized participation in pervasive money laundering schemes and tax evasion crimes, which a former employee has attested extend to ". . . attracting funds from dictatorships and kleptocracies";[34]

---

[32] *See e.g.*, https://www.fca.org.uk/news/press-releases/fca-and-pra-jointly-fine-mr-james-staley-announce-special-requirements.

[33] Examples include the "London Whale Trade" scandal and Kohlberg Kravis Roberts buyout of Brazilian datacenter operator Aceco (founded by STALEY's wife, Debora Nitzan Staley).

[34] Such publicized participation in fact extended to members of the Sex Trafficking Enterprise being named in the "Pandora Papers" in relation to their involvement in money laundering schemes and tax evasion crimes.

d) Elliot's surreptitious relationship with Quintessentially Co-Conspirator Amersi, garnering the publicized concerns expressed by Bahrain's ambassador to the UK—Sheikh Fawaz Al Khalifa—regarding the same;

e) Elliot's publicized relationship with Lubov Chernukhin, and the illicit facets of their business dealings and political relations; and

f) Elliot's involvement in the "cash for curtains" scandal.

176. Notwithstanding such knowledge, due at least in part to its admitted longstanding relationships with members of the Sex Trafficking Enterprise, including Simpson and the "Quintessentially Group," BARCLAYS facilitated the establishment of such accounts through deceptive means, such as falsely indicating that members of the Enterprise were "fully KYC'd" in order to pass regulatory muster. By way of example, BARCLAYS' enablement and facilitation of the Sex Trafficking Enterprise's use of these accounts to commit the Tax Fraud Crimes—particularly to obtain SEIS and EIS UK tax relief under false pretenses—further demonstrates its knowledge and complicity in the financial improprieties perpetrated by the Enterprise over several years.

177. Despite BARCLAYS having been on notice of the Sex Trafficking Enterprise's involvement in a multitude of criminal acts and unlawful conduct, rather than make inquiries into any of the aforementioned facts and events or conduct any due diligence whatsoever, BARCLAYS chose to take on the members of the Enterprise as clients and established dozens of accounts in their names in direct contravention of the governing banking regulations and guidelines outlined above.

178. Despite all of these objectively alarming examples of the criminal acts and unlawful conduct being perpetrated by the Sex Trafficking Enterprise—

particularly in the face of its undeniable knowledge of both STALEY's and the Enterprise's predispositions and propensities to engage in such acts and conduct—BARCLAYS not only chose to accommodate and actively facilitate the banking and financial needs of the Enterprise; it willfully deceived regulatory agencies in its attempts to insulate STALEY from public scrutiny and protect him from regulatory discipline.

179.    Summarily, BARCLAYS not only failed to appropriately screen STALEY and the Sex Trafficking Enterprise—at the outset or at any other point in their relationship—its material misrepresentations and fraudulent concealments to governing regulators and agencies subject it to multifaceted liability, as set forth below.

## V.

## THE STRATEGIC PARTNER DEFENDANTS' CRIMINAL ACTS AND UNLAWFUL CONDUCT SUBJECT THEM TO LIABILITY THAT EXTENDS FAR BEYOND THAT WHICH WAS ADJUDICATED AGAINST JP MORGAN CHASE, DEUTSCHE BANK, AND BANK OF AMERICA

180.    By virtue of their support, facilitation, and participation in the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES, the STRATEGIC PARTNER DEFENDANTS enabled the global infiltration of the Sex Trafficking Enterprise's criminal acts and unlawful conduct, which could never have otherwise reached such magnitudinous levels.

181.    The massive litigation surrounding Jeffrey Epstein and his Sex Trafficking crimes included multiple actions filed in New York against JP Morgan Chase & Co. ("Chase"), styled *Jane Doe 1 v. JP Morgan Chase & Co.* [Case No. 1:22-cv-10019], Deutsche Bank ("Deutsche"), styled *Jane Doe 1 v. Deutsche Bank Aktiengesellschaft, Deutsche Bank AG New York Branch, and Deutsche Bank Trust*

*Company Americas* [Case No. 1:22-cv-10018], and Bank of America, N.A. ("Bank of America"), styled *Jane Doe v. Bank of America, N.A.* [Case No. 1:25-cv-08520]. Not surprisingly, STALEY was a party to the case against Chase, for his participation in Sex Trafficking crimes arranged by Epstein and his entourage while STALEY was employed by Chase.

182.   The similarities between the Sex Trafficking crimes perpetrated by Epstein, and the SEX TRAFFICKING CRIMES of the Sex Trafficking Enterprise are extraordinarily striking, involving many of the same patterns of conduct, Commercial Sex Acts, sexual crimes against young and naïve victims, and financial facilitations and arrangements, to say the least. In fact, on information and belief, Epstein was in attendance at multiple sex parties and events organized by the Sex Trafficking Enterprise, at which STALEY was also present.

183.   However, the similarities of the criminal acts and unlawful conduct perpetrated by BARCLAYS and these other banks end with the STRATEGIC PARTNER DEFENDANTS' active support, facilitation, and participation in the FINANCIAL CRIMES, which far surpasses the conduct alleged against Chase, Deutsche, and Bank of America. As alleged herein, the FINANCIAL CRIMES enabled the SEX TRAFFICKING CRIMES, such that the SEX TRAFFICKING CRIMES could not have otherwise been perpetrated with such all-encompassing reaches.

184.   For their involvement with Epstein:

   a)  Chase paid $290 million to alleged victims;

   b)  Chase paid $75 million to the U.S. Virgin Islands;

   c)  Deutsche paid $75 million to alleged victims;

   d)  Deutsche was fined $150 million by New York state financial regulators; and

e) Bank of America paid $72.5 million to alleged victims.

185.   Notably, on information and belief, STALEY never even worked at Deutsche or Bank of America. Rather, Deutsche essentially served as Epstein's bank from approximately August 2013 to December 2018. As to Bank of America, it merely operated accounts for an Epstein victim which were utilized at Epstein's behest until the time of his death.

186.   In addition, the extent of malfeasance collectively alleged against the aforementioned banks does not even scratch the surface as to the culpability arising out of the criminal acts and unlawful conduct alleged herein, which could not have been perpetrated without the support, facilitation, and participation of BARCLAYS. Yet, due to the draconian laws and regulations governing financial institutions, the aforementioned banks paid handsomely for their liability, including a fine assessed against Deutsche in the amount of $150 million. As alleged herein, the same draconian laws and banking regulations govern BARCLAYS' criminal acts and unlawful conduct, the culpability for which far exceeds that of Chase, Deutsche, and Bank of America.

187.   In this regard, it is noteworthy that the lawsuits against Chase, Deutsche, and Bank of America did not present any facts coming anywhere close to the egregious level of aggravated circumstances surrounding the criminal acts and unlawful conduct alleged herein, particularly as to the degree of intimate knowledge and insight that STALEY had into the Sex Trafficking Enterprise's Sex Trafficking Ventures, which knowledge and insight—cultivated over the course of several years prior to his tenure at BARCLAYS—was imputed to BARCLAYS throughout STALEY's tenure as CEO, most markedly by reason of his active participation in the Sex Trafficking Ventures.

188. Moreover, BARCLAYS was not deterred from hiring and maintaining STALEY's position as CEO, despite the established personal relationship between STALEY and Epstein becoming the subject of international news—as well as STALEY's publicized participation in the Sex Trafficking Ventures arranged by Epstein—which, as alleged herein, BARCLAYS actively attempted to conceal from regulatory agencies in an effort to insulate STALEY from scrutiny and administrative discipline.

189. Accordingly, the liability of the STRATEGIC PARTNER DEFENDANTS far exceeds that which was adjudicated against Chase, Deutsche, and Bank of America, and for the multitude of reasons set forth above, the STRATEGIC PARTNER DEFENDANTS' liability to Plaintiff and all those similarly situated must be adjudged commensurately.

## VI.

## **THIS ACTION MUST PROCEED AS A CLASS**

190. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of themselves and the following Class:

> All persons who were harmed by the Sex Trafficking Enterprise's criminal acts and unlawful conduct during the period of time when the STRATEGIC PARTNER DEFENDANTS provided any banking services for any member of the Sex Trafficking Enterprise.

191. Plaintiff reserves the right to seek leave to modify this definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

192. Numerosity: The Class consists of countless young females and males making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The size of the Class will in part be ascertainable through reference to records maintained by BARCLAYS involving Sex Trafficking Enterprise-related accounts and financial transactions (including but not limited to those reflecting direct transactions with Class members).

193. Typicality: Plaintiff's claims are typical of the claims of the other Class members they seek to represent. The claims of Plaintiff and the other Class members are based on the same legal theories and arise from the same unlawful patterns and practices, to wit, the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES, supported, facilitated, and otherwise participated in by the STRATEGIC PARTNER DEFENDANTS.

194. Commonality: There are many questions of law and fact common to the claims of Plaintiff and the other Class members, and those questions predominate over any questions that may affect any individual member of the Class, within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

195. Common questions of fact and law affecting Class members include, but are not limited to, the following:

   a) The extent to which the STRATEGIC PARTNER DEFENDANTS supported, facilitated, and participated in the Sex Trafficking Enterprise's criminal acts and unlawful conduct in violation of TVPA, 18 U.S.C. § 1591(a)(1);

   b) The extent to which the STRATEGIC PARTNER DEFENDANTS knew or should have known that the Sex Trafficking Enterprise was engaged in violations of the TVPA, 18 U.S.C. § 1591(a);

c) The extent to which the STRATEGIC PARTNER DEFENDANTS knowingly and intentionally supported, facilitated, and otherwise participated in the Sex Trafficking Enterprise's unlawful pattern and practice of forcing victims to engage in Commercial Sex Acts;

d) The extent to which the STRATEGIC PARTNER DEFENDANTS knowingly and intentionally supported, facilitated, and otherwise participated in the Sex Trafficking Enterprise's unlawful pattern and practice of causing victims to engage in Commercial Sex Acts through coercive or fraudulent means;

e) The extent to which the STRATEGIC PARTNER DEFENDANTS benefitted financially or by receiving things of value from their participation in a Venture which has engaged in Sex Trafficking in violation of TVPA, 18 U.S.C. § 1591(a)(1);

f) The extent to which the STRATEGIC PARTNER DEFENDANTS supported, facilitated, and otherwise participated in the FINANCIAL CRIMES;

g) The extent to which extent the STRATEGIC PARTNER DEFENDANTS' support, facilitation, and participation in the FINANCIAL CRIMES helped to further the SEX TRAFFICKING CRIMES;

h) The extent to which the STRATEGIC PARTNER DEFENDANTS committed regulatory breaches, violated banking guidelines, and committed regulatory violations in furtherance of their support, facilitation, and participation in the FINANCIAL CRIMES and SEX TRAFFICKING CRIMES; and

i) The extent to which the STRATEGIC PARTNER DEFENDANTS committed acts or omissions that facilitated sexual abuses, including Sex Trafficking crimes, in violation of governing California state law.

196. Absent a class action, the costs associated with the Class members litigating their individual claims would be enormous and, upon information and belief, beyond the putative Class members' financial capabilities, particularly in light of their young age and limited life experience. The class treatment of common questions of law and fact is also highly advantageous to multiple individual actions or piecemeal litigation, in order to conserve judicial resources and avoid protracted and expensive duplicative actions, in addition to avoiding the possibility of inconsistent adjudications of material claims and issues.

197. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the other Class members they seek to represent. Plaintiff has retained counsel with experience in prosecuting complex litigation. Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor their counsel have any interests adverse to those of the other Class members.

198. As such, this action has been properly brought and will be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, because Plaintiff possesses a well-defined community of interest, and all relevant factors giving rise to the prosecution and maintenance of this action as a class are met, as explained above.

199. Superiority: A class action is superior to all other available litigation methods for the fair and efficient adjudication of this controversy because:

a) Joinder of all Class Members is impracticable;

b) The prosecution of individual actions by members of the Class may result in inconsistent rulings and the impairment of certain Class members' rights, as well as varying remedies against the STRATEGIC PARTNER DEFENDANTS;

c) Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense in which multiple lawsuits would necessarily result;

d) Class treatment of this action will cause an orderly and expeditious administration of the Class claims;

e) Plaintiff and their counsel are unaware of any class action brought against any Defendant for the violations alleged in this action; and

f) This action presents no difficulty that would impede its management by the Court as a class action.

200. Plaintiff accordingly brings the following causes of action individually and on behalf of all Class members who are so similarly situated.

## FIRST CAUSE OF ACTION

## PARTICIPATION IN A VENTURE IN VIOLATION OF TVPA (18 U.S.C. § 1591, et seq.)

### (Against STRATEGIC PARTNER DEFENDANTS and DOES 1-10)

201. Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

202. Plaintiff and the members of the Class are victims of Sex Trafficking within the meaning of 18 U.S.C. § 1591(a) and (b) and are therefore entitled to bring a civil action under 18 U.S.C. § 1595.

203. The STRATEGIC PARTNER DEFENDANTS and the Sex Trafficking Enterprise formed a Venture as defined by 18 U.S.C. § 1591 given that they constitute a "group of two or more individuals associated in fact, whether or not a legal entity."

204. The term "Participation in a Venture" means knowingly assisting, supporting, or facilitating a violation of subsection 18 U.S.C. § 1591 (a)(1). Unlike the criminal penalties provision in the TVPA, the "civil remedy" provision contains a "Constructive Knowledge" component. This allows a civil action to be brought not only against a person or entity who participates in a Venture known to have engaged in illegal Sex Trafficking, but also against a person or entity who participates in a Venture that the person or entity **should have known** has engaged in illegal Sex Trafficking. 18 U.S.C. § 1595(a). This "Constructive Knowledge" provision provides a drastically lesser standard to establish knowledge as part of any plaintiff's civil damages claim.

205. As alleged herein, STALEY not only had intimate knowledge and insight into the SEX TRAFFICKING CRIMES which predated his tenure at BARCLAYS; he actively participated in the criminal acts and unlawful conduct. Accordingly, STALEY knew of the practices the members of the Sex Trafficking Enterprise used to recruit, entice, harbor, transport, provide, obtain, and otherwise solicit young females and males like Plaintiff to engage in Commercial Sex Acts, which practices included threatening to transport Plaintiff to a foreign country to have them killed.

206. In addition, at the bare minimum, BARCLAYS reasonably **should have known** of the facts and events described herein, particularly in light of STALEY's personal relationship with members of the Sex Trafficking Enterprise and by virtue of STALEY's position as CEO of BARCLAYS. As such, the

COMPLAINT
Page 74

STRATEGIC PARTNER DEFENDANTS are subject to liability pursuant to the "civil remedy" provisions of the TVPA. 18 U.S.C. § 1595(a).

207. The STRATEGIC PARTNER DEFENDANTS knowingly participated in the SEX TRAFFICKING CRIMES described above in violation of 18 U.S.C. §1595, not only in aiding and abetting, but in actively supporting and facilitating in the SEX TRAFFICKING CRIMES through domestic and international waters, from which they knowingly benefited.

208. The STRATEGIC PARTNER DEFENDANTS' acts and omissions, taken separately or together, as outlined above, constitute Participation in a Venture in violation of 18 U.S.C. § 1595. The Sex Trafficking Enterprise perpetrated the Sex Trafficking of Plaintiff by forcing, or at a minimum coercing, them to engage in Commercial Sex Acts as described herein. At all relevant times, the STRATEGIC PARTNER DEFENDANTS benefitted from the SEX TRAFFICKING CRIMES in at least the following ways:

    a) Through the bank charges and other funds received for their facilitation of the FINANCIAL CRIMES, which in part funded the SEX TRAFFICKING CRIMES;

    b) Through STALEY's active participation in Commercial Sex Acts with members of the Class, facilitated by the Sex Trafficking Enterprise;

    c) Through monetary deposits and transfers made by the Sex Trafficking Enterprise, as well as the Quintessentially Co-Conspirators, in and through BARCLAYS accounts;

    d) Through the administrative fees incurred from the establishment of numerous accounts for the Sex Trafficking Enterprise, as well as the Shell Entities;

e) Through the patronage of wealthy individuals—including members of the Sex Trafficking Enterprise Patrons and other associates—who were encouraged to bank with BARCLAYS by members of the Sex Trafficking Enterprise; and

f) Through introductions made to influential, aristocratic, and political figures by and through the members of the Sex Trafficking Enterprise.

209. As a direct and proximate result of the STRATEGIC PARTNER DEFENDANTS' conduct as alleged herein, Plaintiff has suffered physical injuries, severe emotional distress and anxiety, humiliation, dehumanization, post-traumatic stress disorder, and other consequential and incidental damages, including but not limited to economic and non-economic harm, medical expenses, psychiatric treatment and psychological counseling, and loss of consortium.

210. Plaintiff also seeks recovery of the "full amount" of their losses pursuant to 18 U.S.C. § 1593, as well as all statutorily mandated damages authorized under 18 U.S.C. §§ 1593A and 1594, reasonable attorneys' fees and costs as provided under 18 U.S.C. § 1595(a), and punitive and exemplary damages. In this regard, the foregoing criminal acts and unlawful conduct were willfully committed with malice, so as to warrant punitive and exemplary damages against these STRATEGIC PARTNER DEFENDANTS, particularly because they intentionally placed their own perverse and depraved sexual interests, as well as their pecuniary and business endeavors and relationships, ahead of Plaintiff's physical and personal safety, mental and emotional wellbeing, and fundamental Constitutional rights.

//

//

//

**SECOND CAUSE OF ACTION**

**CONSPIRACY TO COMMIT VIOLATIONS OF THE TVPA (18 U.S.C. §§ 1591(a)(2), 1595)**

**(Against STRATEGIC PARTNER DEFENDANTS and DOES 1-10)**

211.   Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

212.   The STRATEGIC PARTNER DEFENDANTS intentionally and knowingly conspired with the Sex Trafficking Enterprise to violate TVPA, and to further the SEX TRAFFICKING CRIMES, including through force, or at a minimum coercion, of Plaintiff and all others similarly situated to engage in Commercial Sex Acts in violation of 18 U.S.C. § 1594(c). BARCLAYS employees, specifically STALEY, conspired with members of the Sex Trafficking Enterprise to support, facilitate, and otherwise participate in and further the SEX TRAFFICKING CRIMES.

213.   The STRATEGIC PARTNER DEFENDANTS further conspired with the Sex Trafficking Enterprise to further the FINANCIAL CRIMES, knowing that such criminal acts and unlawful conduct were facilitated in furtherance of the SEX TRAFFICKING CRIMES.

214.   The many overt acts knowingly and intentionally committed by the STRATEGIC PARTNER DEFENDANTS in furtherance of the FINANCIAL CRIMES and SEX TRAFFICKING CRIMES include, but are not limited to:

a) Establishing numerous accounts of the Sex Trafficking Enterprise, including for the Shell Entities;

b) Establishing a banking relationship with Plaintiff and other California residents, which included the opening of Plaintiff's BARCLAYS account, without conducting appropriate due diligence or otherwise

taking even minimal measures to determine the actual purpose of the account;

c) Facilitating electronic transfers of monies to Plaintiff and other members of the Class for their compliance with the sexual abuses and sexual services provided to—among others—the Sex Trafficking Enterprise Patrons;

d) Falsely indicating that members of the Sex Trafficking Enterprise were "fully KYC'd" in order to pass regulatory muster and enable the establishment of such accounts;

e) STALEY's active participation in the grotesque, barbarous, and dehumanizing Commercial Sex Acts perpetrated by the Sex Trafficking Enterprise and the Sex Trafficking Enterprise Patrons;

f) Providing depository and clearing house services for many of the illegitimate Quintessentially Entities, which were formed and operated as alter egos of Quintessentially and the Quintessentially Directors;

g) Providing depository and clearing house services to numerous other illegitimate corporate entities controlled by the Sex Trafficking Enterprise, including the Shell Entities, which were utilized by the Enterprise to further the Tax Fraud Crimes and Money Laundering Schemes;

h) Aiding and abetting the Sex Trafficking Enterprise's Shell Entities in the commission of their Tax Fraud Crimes to obtain qualification for SEIS and EIS UK tax relief under false pretenses;

i) Providing other financial underpinnings necessary for the Sex Trafficking Enterprise to successfully recruit, entice, harbor,

transport, provide, obtain, and otherwise solicit Plaintiff and other members of the Class to precipitate their complicity in Commercial Sex Acts; and

j) Aiding and abetting the Money Laundering Schemes of the Sex Trafficking Enterprise by facilitating the transfers of the Sex Trafficking Enterprise's ill-gotten monies through the various offshore Shell Entities controlled by the Enterprise.

k) Aiding and abetting the Money Laundering Schemes of the Sex Trafficking Enterprise by facilitating the transfers of the Sex Trafficking Enterprise's ill-gotten monies through the various offshore Shell Entities controlled by the Enterprise.

215. It was implicitly understood and a common goal that as a part of the conspiracy, the STRATEGIC PARTNER DEFENDANTS would financially—and otherwise—benefit from their support, facilitation, and participation in the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES. The STRATEGIC PARTNER DEFENDANTS did benefit from their participation in the Venture in at least the following ways:

a) Through the bank charges and other funds received for their facilitation of the FINANCIAL CRIMES, which in part funded the SEX TRAFFICKING CRIMES;

b) Through STALEY's active participation in Commercial Sex Acts with members of the Class, facilitated by the Sex Trafficking Enterprise;

c) Through monetary deposits and transfers made by the Sex Trafficking Enterprise, as well as the Quintessentially Co-Conspirators, in and through BARCLAYS accounts;

d) Through the administrative fees incurred from the establishment of numerous accounts for the Sex Trafficking Enterprise, as well as the Shell Entities;

e) Through the patronage of wealthy individuals—including members of the Sex Trafficking Enterprise Patrons and other associates—who were encouraged to bank with BARCLAYS by members of the Sex Trafficking Enterprise; and

f) Through introductions made to influential, aristocratic, and political figures by and through the members of the Sex Trafficking Enterprise.

216. By virtue of these violations of 18 U.S.C. §§ 1594(c), 1595, the STRATEGIC PARTNER DEFENDANTS are liable to Plaintiff and all other members of the Class for all legally and proximately resulting damages they sustained.

217. As a direct and proximate result of the STRATEGIC PARTNER DEFENDANTS' conduct as alleged herein, Plaintiff has suffered physical injuries, severe emotional distress and anxiety, humiliation, dehumanization, post-traumatic stress disorder, and other consequential and incidental damages, including but not limited to economic and non-economic harm, medical expenses, psychiatric treatment and psychological counseling, and loss of consortium.

218. Plaintiff also seeks recovery of the "full amount" of their losses pursuant to 18 U.S.C. § 1593, as well as all statutorily mandated damages authorized under 18 U.S.C. §§ 1593A and 1594, reasonable attorneys' fees and costs as provided under 18 U.S.C. § 1595(a), and punitive and exemplary damages. In this regard, the foregoing criminal acts and unlawful conduct were willfully committed with malice, so as to warrant punitive and exemplary damages against these STRATEGIC PARTNER DEFENDANTS, particularly because they

intentionally placed their own perverse and depraved sexual interests, as well as their pecuniary and business endeavors and relationships, ahead of Plaintiff's physical and personal safety, mental and emotional wellbeing, and fundamental Constitutional rights.

## THIRD CAUSE OF ACTION

### KNOWINGLY BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF TVPA (18 U.S.C. §§ 1591(a)(2), 1595)

### (Against STRATEGIC PARTNER DEFENDANTS and DOES 1-10)

219.   Plaintiff refer to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

220.   The STRATEGIC PARTNER DEFENDANTS knowingly and intentionally supported, facilitated, and participated in a Sex Trafficking Venture affecting interstate and foreign commerce, with the Sex Trafficking Enterprise, in violation of 18 U.S.C. §§ 1591(a)(1) and (2). BARCLAYS and its employees such as STALEY knowingly benefited from such support, facilitation, and participation in the SEX TRAFFICKING CRIMES.

221.   In this regard, in enabling the Sex Trafficking Enterprise's perpetration of the SEX TRAFFICKING CRIMES—financed by and through the FINANCIAL CRIMES—the STRATEGIC PARTNER DEFENDANTS knowingly benefited from all such criminal acts and unlawful conduct, including by virtue of the thousands of transactions processed through the numerous[35] accounts held by the Enterprise over the course of several years.

---

[35] Plaintiff is informed and believes that over fifty accounts were established at BARCLAYS by various members of the Sex Trafficking Enterprise.

222. The many overt acts knowingly and intentionally committed by the STRATEGIC PARTNER DEFENDANTS in furtherance of the FINANCIAL CRIMES and SEX TRAFFICKING CRIMES include, but are not limited to:

a) Establishing numerous accounts of the Sex Trafficking Enterprise, including for the Shell Entities;

b) Establishing a banking relationship with Plaintiff and other California residents, which included the opening of Plaintiff's BARCLAYS account, without conducting appropriate due diligence or otherwise taking even minimal measures to determine the actual purpose of the account;

c) Facilitating electronic transfers of monies to Plaintiff and other members of the Class for their compliance with the sexual abuses and sexual services provided to—among others—the Sex Trafficking Enterprise Patrons;

d) Falsely indicating that members of the Sex Trafficking Enterprise were "fully KYC'd" in order to pass regulatory muster and enable the establishment of such accounts;

e) STALEY's active participation in the grotesque, barbarous, and dehumanizing Commercial Sex Acts perpetrated by the Sex Trafficking Enterprise and the Sex Trafficking Enterprise Patrons;

f) Providing depository and clearing house services for many of the illegitimate Quintessentially Entities, which were formed and operated as alter egos of Quintessentially and the Quintessentially Directors;

g) Providing depository and clearing house services to numerous other illegitimate corporate entities controlled by the Sex Trafficking

Enterprise, including the Shell Entities, which were utilized by the Enterprise to further the Tax Fraud Crimes and Money Laundering Schemes;

h) Aiding and abetting the Sex Trafficking Enterprise's Shell Entities in the commission of their Tax Fraud Crimes to obtain qualification for SEIS and EIS UK tax relief under false pretenses;

i) Providing other financial underpinnings necessary for the Sex Trafficking Enterprise to successfully recruit, entice, harbor, transport, provide, obtain, and otherwise solicit Plaintiff and other members of the Class to precipitate their complicity in Commercial Sex Acts; and

j) Aiding and abetting the Money Laundering Schemes of the Sex Trafficking Enterprise by facilitating the transfers of the Sex Trafficking Enterprise's ill-gotten monies through the various offshore Shell Entities controlled by the Enterprise.

223. It was a premeditated and necessary byproduct—as well as a common goal of the Sex Trafficking Enterprise—that the STRATEGIC PARTNER DEFENDANTS would financially prosper and otherwise benefit from their support, facilitation, and participation in the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES, which they did in at least the following ways:

a) Through STALEY's active participation in Commercial Sex Acts with members of the Class, facilitated by the Sex Trafficking Enterprise;

b) Through the revenues realized by BARCLAYS' custody, servicing, investment utilization, and other liquidity benefits derived from the maintenance of the numerous accounts held by members of the Sex Trafficking Enterprise and certain of the Shell Entities;

c) Through the thousands of monetary deposits and withdrawals, digital fund exchanges, and electronic transfers made by the Sex Trafficking Enterprise, into, through and between numerous BARCLAYS accounts;

d) Through the bank fees, finance charges, and other incidental assessments BARCLAYS realized from the perpetration of the FINANCIAL CRIMES used to fund the SEX TRAFFICKING CRIMES;

e) Through the administrative charges earned from the establishment and maintenance of the numerous accounts held by members of the Sex Trafficking Enterprise and certain of the Shell Entities; and

f) Through the patronage of wealthy individuals—including members of the Sex Trafficking Enterprise Patrons and other associates—who were encouraged to bank with BARCLAYS by members of the Enterprise.

224. In addition to the foregoing, the STRATEGIC PARTNER DEFENDANTS also intentionally and knowingly concealed the true ownership of BARCLAYS accounts through the misappropriation of Plaintiff's and other victims' identities, which were exploited for the purpose of shielding members of the Sex Trafficking Enterprise from the certain liabilities resulting from their criminal acts and unlawful conduct. Moreover, the STRATEGIC PARTNER DEFENDANTS helped to conceal the existence of the Enterprise by enabling and facilitating financial transactions—such as provision of cash—to avoid leaving any "paper trail" that could later be traced by regulatory agencies and law enforcement.

225. The STRATEGIC PARTNER DEFENDANTS' tortious conduct included a complete failure to competently and appropriately oversee the numerous

transactions conducted by the sundry members of the Sex Trafficking Enterprise, particularly by virtue of BARCLAYS' systemic failure to file any SARs for the numerous objectively suspicious (and criminal) transactions conducted by the Enterprise. In this regard, the STRATEGIC PARTNER DEFENDANTS not only failed to implement any form of monitoring which should otherwise have prevented the Enterprise from perpetrating and furthering the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES; they went so far as to enable and facilitate the criminal acts and unlawful conduct of the Enterprise.

226. The STRATEGIC PARTNER DEFENDANTS knew, and were in reckless disregard of the fact, that it was the Sex Trafficking Enterprise's systematic pattern and practice to use the channels and instrumentalities of interstate and foreign commerce to entice, recruit, solicit, harbor, provide, obtain, and transport young persons to engage in Commercial Sex Acts, in violation of 18 U.S.C. § 1591(a)(1).

227. As such, the STRATEGIC PARTNER DEFENDANTS had actual knowledge that they were supporting, facilitating and participating in the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES aimed at enticing, recruiting, soliciting, harboring, providing, obtaining, and transporting Plaintiff and other Class members for the purpose of engaging in Commercial Sex Acts through means of force, threats of force, fraud, and coercion.

228. By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2) and 1595, the STRATEGIC PARTNER DEFENDANTS are liable to Plaintiff and the other members of the Class for the damages they sustained, including physical injuries, severe emotional distress and anxiety, humiliation, dehumanization, post-traumatic stress disorder, and other consequential and incidental damages, encompassing economic and non-economic harm, as well as

medical expenses, psychiatric treatment and psychological counseling, and loss of consortium.

229. In this regard, Plaintiff seeks recovery of the "full amount" of her losses pursuant to 18 U.S.C. § 1593, as well as all statutorily mandated damages authorized under 18 U.S.C. §§ 1593A and 1594, reasonable attorneys fees and costs as provided under 18 U.S.C. § 1595(a), and punitive and exemplary damages. To this end, the foregoing criminal acts and unlawful conduct were willfully committed with malice, so as to warrant punitive and exemplary damages against these STRATEGIC PARTNER DEFENDANTS, particularly because they intentionally placed their own perverse and depraved sexual interests, as well as their pecuniary and business endeavors and relationships, ahead of Plaintiff and the other Class members' physical and personal safety, mental and emotional wellbeing, and fundamental Constitutional rights.

## FOURTH CAUSE OF ACTION

## OBSTRUCTION OF ENFORCEMENT OF THE TVPA (18 U.S.C. § 1591(d))

### (Against STRATEGIC PARTNER DEFENDANTS and DOES 1-10)

230. Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

231. BARCLAYS and its officers and employees—namely STALEY—intentionally and knowingly obstructed, attempted to obstruct, interfered with, and prevented the enforcement of 18 U.S.C. §§ 1591(a)(1) & (a)(2), all in violation of 18 U.S.C. § 1591(d).

232. The STRATEGIC PARTNER DEFENDANTS' obstruction of the enforcement of 18 U.S.C. §§ 1591(a)(1) and (a)(2) was forbidden by 18 U.S.C. § 1591(d), and BARCLAYS thereby violated Chapter 77, Title 18. Such obstruction directly, proximately, and foreseeably harmed Plaintiff and the other members of

the Class by causing their entrapment in the SEX TRAFFICKING CRIMES through means of force, threats of force, fraud, and coercion. In furtherance of their interference, obstruction, and prevention of the federal government's enforcement of the TVPA, the STRATEGIC PARTNER DEFENDANTS entirely failed to comply with AML and Anti-Structuring reporting requirements in addition to other mandates in the Banking Secrecy Act and ancillary California state laws and regulations. These requirements obligated the STRATEGIC PARTNER DEFENDANTS to review, audit and investigate the thousands of transactions flowing through the Sex Trafficking Enterprise's sundry BARCLAYS accounts to determine whether any such transactions raised red flags, were indicative of potentially illicit activity, or were otherwise reasonably suspicious.

233. The STRATEGIC PARTNER DEFENDANTS interfered with, obstructed,  attempted to obstruct, and prevented the federal government's enforcement of the TVPA, by failing to timely file the required SARs, failing to report reasonably suspicious activity with the Financial Crimes Enforcement Network of the U.S. Department of Treasury (FinCEN), and otherwise  failing to comply with its reporting requirements under the BSA and ancillary California state laws and regulations. In committing these egregious breaches, the STRATEGIC PARTNER DEFENDANTS concealed from the federal government's attention the Sex Trafficking Enterprise's commission of the FINANCIAL CRIMES, which directly enabled and facilitated the SEX TRAFFICKING CRIMES.

234. If the STRATEGIC PARTNER DEFENDANTS had observed and complied with their legal obligations, the Sex Trafficking Enterprise's criminal acts and unlawful conduct would not have been enabled, and the governing authoritative agencies would have been well-positioned to investigate and ultimately put an end to the FINANCIAL CRIMES and SEX TRAFFICKING CRIMES.

235.    By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(2) and 1595, the STRATEGIC PARTNER DEFENDANTS are liable to Plaintiff and the other members of the Class for the damages they sustained, including physical injuries, severe emotional distress and anxiety, humiliation, dehumanization, post-traumatic stress disorder, and other consequential and incidental damages, encompassing economic and non-economic harm, as well as medical expenses, psychiatric treatment and psychological counseling, and loss of consortium.

236.    In this regard, Plaintiff seeks recovery of the "full amount" of her losses pursuant to 18 U.S.C. § 1593, as well as all statutorily mandated damages authorized under 18 U.S.C. §§ 1593A and 1594, reasonable attorneys fees and costs as provided under 18 U.S.C. § 1595(a), and punitive and exemplary damages. To this end, the foregoing criminal acts and unlawful conduct were willfully committed with malice, so as to warrant punitive and exemplary damages against these STRATEGIC PARTNER DEFENDANTS, particularly because they intentionally placed their own perverse and depraved sexual interests, as well as their pecuniary and business endeavors and relationships, ahead of Plaintiff and the other Class members' physical and personal safety, mental and emotional wellbeing, and fundamental Constitutional rights.

## FIFTH CAUSE OF ACTION

### NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE TO PREVENT PHYSICAL HARM

### (Against STRATEGIC PARTNER DEFENDANTS and DOES 1-10)

237.    Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

COMPLAINT
Page 88

238. The STRATEGIC PARTNER DEFENDANTS owed a duty to Plaintiff and the Class members to exercise reasonable care to avoid creating a risk of physical harm to them. The STRATEGIC PARTNER DEFENDANTS' duties included refraining from committing the tortious conduct that enabled and facilitated the SEX TRAFFICKING CRIMES and the FINANCIAL CRIMES, particularly as to such acts and conduct that directly violated California Code of Civil Procedure § 52.5, California Penal Code § 243.4, and of Title 9 of the California Penal Code, including Penal Code §§ 261, 264.1, 287, and 289.

239. The physical harm that directly and proximately resulted from the STRATEGIC PARTNER DEFENDANTS' tortious conduct was reasonably foreseeable to the STRATEGIC PARTNER DEFENDANTS, particularly the continuing harm and damages that Plaintiff and the other Class members have sustained, as alleged herein. But for such acts and conduct, Plaintiff and the Class members would not have sustained the harm and damages from which they continue to suffer.

240. Plaintiff and the other Class members were within the zone of foreseeable harm and fell within the class of persons foreseeably at risk of harm from the STRATEGIC PARTNER DEFENDANTS' negligent acts and omissions. Such negligent acts and omissions created substantial risk of the very harm and damages suffered by Plaintiff and the other Class members, which was substantially certain to result from the Sex Trafficking Enterprise's commission of the SEX TRAFFICKING CRIMES and the FINANCIAL CRIMES.

241. As a direct and proximate result of the STRATEGIC PARTNER DEFENDANTS' negligent failure to exercise reasonable care to prevent physical harm, Plaintiff has suffered physical injuries, severe emotional distress and anxiety, humiliation, dehumanization, post-traumatic stress disorder, and other

consequential and incidental damages, including but not limited to economic and non-economic harm, medical expenses, psychiatric treatment and psychological counseling, and loss of consortium.

## SIXTH CAUSE OF ACTION

## NEGLIGENT FAILURE TO EXERCISE REASONABLE CARE AS A BANKING INSTITUTION PROVIDING NON-ROUTINE BANKING SERVICES

### (Against BARCLAYS and DOES 7-10)

242.   Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

243.   BARCLAYS owed a duty to Plaintiff and the Class members to exercise reasonable care to prevent the Sex Trafficking Enterprise from engaging in the criminal acts and unlawful conduct alleged herein.   In this regard, BARCLAYS owed a duty to refrain from providing non-routine banking services for the benefit of the Sex Trafficking Enterprise that they had reason to know would enable and facilitate the perpetration of the SEX TRAFFICKING CRIMES and the FINANCIAL CRIMES committed against Plaintiff and the Class Members.

244.   BARCLAYS also owed a legal duty to Plaintiff and the Class members to abide by and comply with BSA and AML laws, KYC regulations, and the Anti-Structuring rules set forth herein, so as to refrain from enabling and facilitating the SEX TRAFFICKING CRIMES and the FINANCIAL CRIMES, and otherwise abstain from creating opportunity and occasion for the criminal acts and unlawful conduct set forth herein to take place.

245.   In the exercise of reasonable care, BARCLAYS also should have known of the dangerous propensities of the Sex Trafficking Enterprise to commit the SEX TRAFFICKING CRIMES and the FINANCIAL CRIMES, particularly in

light of BARCLAYS' knowledge of STALEY's and the Enterprise's criminal propensities, as set forth herein.

246. These duties exist in situations where a bank is knowingly providing services beyond routine banking to its customers.

247. As set forth herein, BARCLAYS enabled and facilitated the Sex Trafficking Enterprise's commission of the criminal acts and unlawful conduct alleged herein, in violation of California Code of Civil Procedure § 52.5, California Penal Code § 243.4, and of Title 9 of the California Penal Code, including Penal Code §§ 261, 264.1, 287, and 289. In enabling and facilitating the SEX TRAFFICKING CRIMES and the FINANCIAL CRIMES, BARCLAYS in particular was willfully blind to the fact that it was providing services extending beyond routine banking solely for the benefit of the Enterprise.

248. Similarly, in committing the tortious conduct that enabled and facilitated the SEX TRAFFICKING CRIMES and the FINANCIAL CRIMES, BARCLAYS necessarily violated numerous banking regulations in their financial dealings with the Enterprise, including their violations of BSA and AML laws, KYC regulations, and Anti-Structuring rules.

249. BARCLAYS breached its legal duties to Plaintiff and the other Class members as described herein. These breaches directly and proximately resulted in their failure to prevent the Sex Trafficking Enterprise from committing the violations of California Code of Civil Procedure § 52.5, California Penal Code § 243.4, and of Title 9 of the California Penal Code, including Penal Code §§ 261, 264.1, 287, and 289.

250. As a direct and proximate result of BARCLAYS' negligent failure to exercise reasonable care as a banking institution providing non-routine banking services, Plaintiff has suffered physical injuries, severe emotional distress and

anxiety, humiliation, dehumanization, post-traumatic stress disorder, and other consequential and incidental damages, including but not limited to economic and non-economic harm, medical expenses, psychiatric treatment and psychological counseling, and loss of consortium.

## SEVENTH CAUSE OF ACTION

## NEGLIGENT HIRING

### (Against BARCLAYS and DOES 1-10)

251.   Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

252.   California law has long held that an employer is liable to third persons "for the employer's negligence in hiring or retaining an employee who is incompetent or unfit." (*Roman Catholic Bishop v. Superior Court* (1996) 42 Cal. App. 4th 1556.)

253.   BARCLAYS had a duty to ensure that its hiring practices excluded persons with propensities to commit criminal acts and unlawful conduct that created particular risks of harm to customers like Plaintiff.

254.   Likewise, BARCLAYS had a further duty to ensure that its retention practices excluded persons with prior incidents and a history of committing criminal acts and unlawful conduct with the likes of known Sex Trafficker Jeffrey Epstein.

255.   As described herein, BARCLAYS breached these duties by hiring and retaining STALEY, who had a well-documented relationship with Jeffrey Epstein prior to his being hired, and whom BARCLAYS had actual knowledge engaged in a wide array of criminal acts and unlawful conduct akin to the SEX TRAFFICKING CRIMES and FINANCIAL CRIMES.

256.   It was reasonably foreseeable to BARCLAYS that hiring an individual like STALEY as the CEO of the company would place him in a position to exploit substantial authority and provide him with the opportunity to engage in precisely the same criminal acts and unlawful conduct described herein, and cause the continuing harm and damages from which Plaintiff and the other Class members continue to suffer.

257.   As a direct and proximate result of BARCLAYS' negligent hiring of STALEY, Plaintiff has suffered physical injuries, severe emotional distress and anxiety, humiliation, dehumanization, post-traumatic stress disorder, and other consequential and incidental damages, including but not limited to economic and non-economic harm, medical expenses, psychiatric treatment and psychological counseling, and loss of consortium.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the STRATEGIC PARTNER DEFENDANTS, and each of them, as follows:

**ON THE FIRST, SECOND, THIRD, AND FOURTH CAUSES OF ACTION:**

- That the Court award Plaintiff and the other members of the Class all compensatory damages available at law, including general and special damages, economic and non-economic damages, and all available direct and consequential damages against each of the STRATEGIC PARTNER DEFENDANTS;

- That the Court issue all appropriate penalties and sanctions imposed by the statutes that were violated as cited herein;

- That the Court award Plaintiff and the other members of the Class punitive and exemplary damages in amounts that appropriately punish each of the

STRATEGIC PARTNER DEFENDANTS for the horrific criminal acts and unlawful conduct perpetrated against Plaintiff and the other members of the Class as alleged herein; and

- That the Court award Plaintiff and the other members of the Class all reasonable attorneys fees incurred in preparing and prosecuting this action.

**ON THE FIFTH, SIXTH, AND SEVENTH CAUSES OF ACTION:**

- That the Court award Plaintiff and the other members of the Class all compensatory damages available at law, including general and special damages, economic and non-economic damages, and all available direct and consequential damages against each of the STRATEGIC PARTNER DEFENDANTS.

**ON ALL CAUSES OF ACTION:**

- That the Court certify the Class, name Plaintiff as Class Representative, and appoint her lawyers as Class counsel;
- That the Court award to Plaintiff and all members of the Class all costs and expenses incurred in preparing and prosecuting this action;
- That the Court award pre- and post-judgment interest at the maximum legal rate; and
- That the Court grant all such other and further relief as available at law and in equity.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial in this action before the Court.

Dated:  May 28, 2026          POWERHOUSE LEGAL, P.C.

_____

Marc Lazo
Alexander Powers
Attorneys for Plaintiff